UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Saman Ghahremani | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:05CV01270 |
| v. | ) | Judge Colleen Kollar-Kotelly |
| | ) | |
| Uptown Partners, L.L.C. | ) | Oral Argument Requested |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
AND
IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE NOTICE OF PENDENCY OF
ACTION (LIS PENDENS) AND TO QUASH THE ENCUMBRANCE CREATED BY ITS FILING[1]

The Motions

Defendant has filed two Motions, one to dismiss the Complaint and the other to strike the

notice given by Plaintiff of the lis pendens created by this action.  Neither Motion should be granted.

Because the two Motions raise very similar issues, Plaintiff will address both in this Memorandum.

Both Motions rely upon the contract which is the target of the Complaint.  As will be shown

below, the contract is utterly unconscionable and, among other problems, violative of the District of

Columbia Consumer Protection Act, §28-3901, et seq., D.C. Code (1981 ed.).[2]

The standards regarding motions to dismiss under Rule 12(b)(6), F.R.Civ.P. are well known.

Just recently this Court, Friedman, J., restated those standards in Bannum, Inc. v. Citizens for a Safe

---

[1] The Affidavit of Farzad Davaryd is attached hereto as Exhibit 1 and incorporated herein.  In turn, attached to Mr. Davaryd's Affidavit is a copy of his contract with Defendant which is identified as Exhibit A to that Affidavit.  Dr. Ghahremani's Affidavit is attached as Exhibit 2. The factual recitations herein are taken from these Affidavits and from the Complaint which the Court must accept as true.

[2] The Court can determine on this record whether the contract is unconscionable as a matter of law.  Potter v. Wilbur-Ellis Co., 62 Wash.App. 318, 328, 814 Ps. 2d 670 (1991).

Ward Five, Inc., 2005 WL 1906393, *4-5 (D.D.C. 2005) as follows:

> On a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must assume the truth of the facts alleged in the complaint and may grant the motion only if it appears beyond doubt that the plaintiff will be unable to prove any set of facts that would justify relief . . . The complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff the benefit of all inferences that can be derived from the facts alleged. (Citations Omitted)

It is respectfully submitted that the allegations of the Complaint sets out a proper cause of action and if the Court treats those allegations as true, as Defendant concedes that it must, it cannot find "beyond doubt that the plaintiff will be unable to prove any set of facts that would justify relief."

The Motion to Dismiss depends on Defendant's allegation that Plaintiff Saman Ghahremani breached the contract that he seeks to enforce because the other shown purchaser, Dr. Farzad Davaryd, and Dr. Ghahremani "breached the warranty . . . that the intended to occupy the Property as their primary residence." Memorandum, page 1.[3] The Motion bootstraps the misstatement of Dr. Davaryd's position to allege that *he* breached the contract by not appearing at settlement. Finally, it alleges without a scrap of record evidence that Dr. Davaryd "assigned" his interest in the contract to Dr. Ghahremani. Memorandum, page 2. Understandably, none of the positions taken by Defendant are supported by an Affidavit.

The other Motion challenges the *lis pendens* filed by Dr. Ghahremani. The subject contract does forbid such an action. For reasons shown below, the portions of the contract upon which Defendant must depend in this action are unenforceable.

First, it is important for the Court to understand that the subject contract was created as a

---

[3]    As will be shown below, on the facts of this case there was no such warranty. Further, even had there been a "warranty" the contract was modified to eliminate Dr. Davaryd and even if that were not true, the Defendant does not allege that it was damaged by any breach of the so-called warranty.

modern form of the old shell game. In fact, the contract was set up exactly to do the following: If the

price of the unit had gone down or stayed flat, the Defendant had the right to enforce the contract.

If the price went up, Defendant did not have to honor the contract. It is this heads I win - tails you

lose element in the contract that is hidden in the contract that makes it unconscionable and which

violates the Consumer Protection Act.

Simply stated, the contract does not require Defendant to deliver the property if it decides not

to. Paragraph 15 (Exhibit 1 to the Complaint) provides that *if the Purchaser* is in default he agrees

that his Ernest Money Deposit along with all interest on that deposit "shall be forfeited as liquidated

damages." However, *if Seller* defaults, Paragraph 15 provides that the purchaser *gets back his deposit*

"as Purchaser's sole damages." Paragraph 15 goes on to declare that the return of the deposit is

payment of "liquidated damages." The deposit is part of the contract price. Had this mater gone to

settlement, the deposit would have been a credit to Plaintiff as purchaser. The deposit is obviously

is not earned by the seller unless the contract goes to settlement. Thus, its return is not

"consideration" or "damages" or "liquidated damages."

To make sure that a purchaser has no rights, the contract eliminates all equitable remedies that

a purchaser should have. In an attempt to cutoff the traditional specific performance relief that the

law accords a purchaser, the contract hides in an entirely inappropriate part of the contract, namely

Paragraph 4(a) which deals with the mechanics of settlement, the following:

"Equitable title shall remain vested in the Seller until the delivery of the deed."

No explanation is provided that would alert a lay reader that he or she was giving up a valuable legal

right. Defendant has effectively hidden from a lay reader the consequences of not receiving equitable

title. Those consquences appear 18 paragraphs later in Paragraph 22 despite the obvious connection

between the two. Paragraph 22(c), which Defendant has carefully hidden as a "Miscellaneous" item, provides that:

> Purchaser is expressly prohibited from recording, and covenants not to record, this Agreement, any memorandum thereof or any list [sic] pendents whether or not the Seller is at any time in default hereof.

Again no explanation is provided that would make such a provision at all meaningful to a lay reader.

No equitable title and no right to file a lis pendens and not a word in the contract which alerts the average purchaser that he or she is giving away the farm. Cutting off a purchaser's equitable remedies is a serious matter, one that should at least have been somehow highlighted in the contract. Instead, as shown above, the destruction of the two parts of a purchaser's equitable rights (equitable title and the right to enforce the equitable title) are separated and hidden in the opaque language of two otherwise inapposite provisions. It is generally the law that a contract purchaser is vested with "equitable title." In SMS Associates v. Clay, 868 F.Supp. 337, 340 (D.D.C. 1994), the rule was stated as follows:

> Defendant's argument that plaintiff was not accorded equitable title in the land pursuant to the contract of sale entered into in 1983, but rather that plaintiff acquired title when Judge Kessler ordered specific performance of the contract, cannot be credited by the Court. "Equitable conversion results in the conceptualization that the purchaser becomes the equitable owner of the property and the vendor is equitably entitled to the purchase money promised in the contract as soon as a valid, enforceable contract arises." [FN1] [Emphasis supplied] POWELL & ROHAN, supra, at 81-96.
>
> > FN1. "In one sense, the relationship between vendor and purchaser is wholly personal, with the right of either to sue the other in event of breach. In another sense, the contract creates a status of vendor-purchaser and the latter acquires real rights in the property due to the possibility of specific performance. Equity . . . looks upon the purchaser as having equitable title to the land even thought the legal title remains in the vendor." JOHN E. CRIBBET AND CORWIN W.JOHNSON, PRINCIPLES OF THE LAW OF PROPERTY, 186 (1989).

It is thus clear, that the linkage of equitable title and the right to specific performance is exactly why the law recognizes these rights. Recognition of the practical need for "equitable title" is as old as the law of real estate. As stated in <u>Nichols v. Bealmear</u>, 36 App.D.C. 352, 1911 WL 20061 (App.D.C. 1911):

> From the date of the execution of the contract, there was, in equity, a sale and conversion of the respective properties. Thereafter plaintiff held the legal title to the property to be formally conveyed by him as trustee for defendant, and defendant in turn held the legal title to the property to be conveyed by him as trustee for plaintiff. *Griffith v. Stewart*, 31 App. D. C. 29; *Lenman v. Jones*, 33 App. D. C. 7. <u>The equitable title having passed by the contract, the plaintiff's equitable interest in the property to be conveyed would avail against any subsequent encumbrance or conveyance acquired from the defendant with notice.</u> (Emphasis added)

As early as 1829, the Supreme Court held in a District of Columbia case, <u>The Columbian Insurance Company of Alexandria v. John W. Lawrence</u> 27 U.S. 25, 29, 2 Pet. 25, 1829 WL 3191, 7 L.Ed. 335 (1829):

> That an equitable interest may be insured is admitted; and we can perceive no reason which excludes an interest held under an executory contract. While the contract subsists, the person claiming under it has, undoubtedly, a substantial interest in the property. If it be destroyed, the loss, in contemplation of law, is his. If the purchase money be paid, it is his in fact. If he owes the purchase money the property is equivalent, and is still valuable to him.

As shown, the contract leaves the Defendant free to "default" without penalty and without allowing a purchaser the equitable rights which are standard in this area of the law. Defendant is only required to return the deposit which it has not earned because it did not perform. That is not a contract that this Court should consider enforcing. The very idea that the return of an unearned deposit constitutes payment of "damages" to the disappointed purchaser is insulting and it is remarkable that such a contract is presented to the Court by Defendant as being one that any court should enforce. Such a contract is described in the Restatement (Second) of Contracts, §77 as being one without

consideration as follows:

> A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances unless
>
> (a) each of the alternative performances would have been consideration if it alone had been bargained for; or
>
> (b) one of the alternative performances would have been consideration and there is or appears to the parties to be a substantial possibility that before the promisor exercises his choice events may eliminate the alternatives which would not have been consideration.

<u>The Events of December 13, 2002</u>

On December 13, 2002, Plaintiff and a friend of his, Dr. Farzad Davaryd, went to a sales office maintained by Defendant. They met with Defendant's chosen real estate agent, Kathryn W. Wells. Ms. Wells explained that because Plaintiff was not on the waiting list for the condominium units Defendant was selling at the Langston Hughes Condominium, he could not submit a contract on the subject condominium unit. However, she noted that Mr. Davaryd was on the waiting list and that if they were both shown as purchasers that seller would permit the unit to be purchased by Dr. Ghahremani alone. As stated in Paragraph 6 of the Complaint:

> 6.        In Exhibit 1 [the real estate contract attached to the Complaint], Dr. Ghahremani is listed as one of two purchasers, the other being Farzel [sic] Davarya, a friend of his. On December 13, 2002, prior to signing the Contract, Dr. Ghahremani and Mr. Davarya met with a real estate agent who represented Uptown. The agent suggested that Mr. Davarya be shown on the Contract as one of the purchasers because he was already on a waiting list for a Unit and Dr. Ghahremani was not. The agent assured them that there was no problem with that and that the deed would be prepared to show Dr. Ghahremani as the sole purchaser at closing.[4]

On the same day that the contract in suit was signed by Mr. Davarya and Dr. Ghahremani, Mr.

---

[4] The Affidavits of both Dr. Ghahremani and Dr. Farzad support the allegations of the Complaint.

Davarya wrote a contract on his own behalf to purchase another unit in the subject condominium building and gave it to Ms. Wells. Both contracts were accepted by the Seller. Affidavits of Dr. Davarya, Paragraph 6, and Dr. Ghahremani. Thus, Defendant knew that Mr. Davarya's name was on both contracts and that he could not have intended to live in both units, yet it accepted both contracts.

The Contract in Suit is an Adhesion Contract

The contract at issue that Dr. Ghahremani signed on December 13, 2002, was clearly a contract of adhesion as this Court has defined that term Owens-Illinois, Inc. v. Aetna Cas. and Sur. Co., 597 F.Supp. 1515, 1523, n. 15 (D.D.C. 1984):

> FN15. Adhesion contracts have been defined as standard form contracts, offered on a take it leave it basis by one party to a second party with much less bargaining power.

That same definition appears in Gray v. American Express Company, 240 U.S.App.D.C. 10, 18. 743 F.2d 10, 18 (D.D.C. 1987), where this Court applied New York law as follows:

> [An] adhesion contract is a "standardized contract form" offered without realistic opportunity to bargain and in which consumer must acquiesce to obtain desired product or service. (Citations and internal punctuation deleted for clarity)

The Affidavits attached hereto evidence that the subject contract is a contract of adhesion and one that does not deserve the support of a Court. It is the law as shown in these cases that this Court must approach a standardized contract with scepticism. Dr. Ghahremani's Affidavit establishes that the form contract which he signed was presented by Ms. Wells on a take it or leave it basis and therefore the contract is suit is clearly an adhesion. If he wanted one of the subject units, he had to accept the contract.

The Court is well aware of the care with which it must approach and adhesion contract.

<u>Defendant has Ratified the Contract</u>

The District of Columbia follows the black letter law regarding ratification.  As stated in

<u>Lewis v. Washington Metro. Area Transit Authority</u>, 463 A.2d 666, 671-672 (D.C. 1983):

> Even if the evidence of implied authority for [the agent]  to execute the release were
> inadequate, there was sufficient evidence to put the question of ratification to the jury.
> Although an agent may not be authorized to do a certain act, if the principal, with
> knowledge of the act, acquiesces in it, by allowing the agent to do similar acts, or by
> retaining the benefits of the act when it was done in service to him, then the past
> unauthorized act is ratified. . . . The principal may ratify the act expressly or impliedly,
> by conduct inconsistent with any other hypothesis; and once he has done so he is
> bound by the agent's act nunc pro tunc. The agent must have purported to act on behalf
> of the principal; however, he need not have represented to the third party that he was
> authorized to act for the principal.(Citations and footnotes omitted)

The Affidavits attached hereto as Exhibits 1 and 2 are proof that Defendant and its agents had

full knowledge of the facts alleged in the Complaint and that Defendant knowingly entered into the

contract knowing that Dr. Farzad had signed a contract on an different unit on the same day that he

signed the subject contract and that all of this was done with the assistance of Defendant's agent, Ms.

Wells.  It is black letter law that the knowledge of Defendant's agent of the reason that Mr. Davarya's

name   appeared  on  the  contract  in  suit  would  be  attributable  to  Defendant.   As  stated  in

<u>District-Realty Title Ins. Corp. v. Forman</u>,  518 A.2d 1004, 1009 (D.C. 1986):

> So long as an agent has information in his mind when acting for his principal or
> acquires it under such circumstances that it can be presumed to be in his mind at the
> time of the transaction, such knowledge is imputed to the principal even if it was
> acquired prior to the start of the agency relationship. *Bowen v. Mt. Vernon Savings
> Bank*, 70 U.S.App.D.C. 273, 275, 105 F.2d 796, 798 (1939). See also Restatement
> (Second) of Agency § 276 (1971); 3 Am.Jur.2d Agency § 287 (1986).

This Court is to look to the law of the District of Columbia for the substantive rules of

decision, <u>Gray v. American Express Company</u>, 240 U.S. App. D.C. 10, 16,  743 F. 2d 10, 16 (1984),

but as shown by the citation to <u>Bowen</u> in <u>District-Realty</u>, the United States Court of Appeals for the

District of Columbia Circuit reached the same conclusion in regard to the rules of attribution of

knowledge as that reached by the District of Columbia Court of Appeals.

This Court has applied the same agency attribution rule. In National R.R. Passenger Corp.

v. Notter, 677 F.Supp. 1, 6 (D.D.C. 1987), this Court held:

> Nor can Amtrak establish that it did not "know," as a corporate principal, of USANL's lease with the Government. Under principles of agency law, a principal is charged with knowledge of facts known to his agent which the agent had a responsibility to bring to the attention of the principal . . . Bowen v. Mount Vernon Savings Bank, 105 F.2d 796, 799 (D.C.Cir.1939) (rule seeks to prevent "the injustice of allowing the principal to avoid, by acting vicariously, burdens to which he would become subject if he were acting for himself").

Defendant seeks to hide behind the parol evidence rule and the integration clause but the acts

that are the subject of this action were the acts of its *own agent*. Further, since Defendant accepted

both contracts, this goes beyond attributed knowledge.  Defendant, having entered into two contracts

with Mr. Davarya on the same day should not be heard that it thought he was buying both to be his

primary residence. As shown above, ratification is "nunc pro tunc," Lewis v. Washington Metro. Area

Transit Authority, supra, and thus Defendant has no legally cognizable complaint about the events

of December 13, 2002.

Events Subsequent to December 13, 2002 Constituted Modification of the Contract

Paragraphs 7 and 8 of the Complaint are as follows:

> 7.      On April 2, 2005, the Contract was amended by an Addendum signed only by Dr. Ghahremani and Uptown (along with Uptown's real estate broker) changing the price and showing Dr. Ghahremani as the sole purchaser.  A copy of the Addendum is attached hereto and incorporated herein as Exhibit 2.

> 8.      As further evidence that the parties to the Contract were Dr. Ghahremani and Uptown, in September of 2003, the parties entered into a price amendment related to certain options to be added to the Unit.  This Agreement is attached hereto and incorporated herein as Exhibit 3 and it is signed only by Uptown

and Dr. Ghahremani's wife.

Mr. Davarya's Affidavit confirms that after December 13, 2002, Defendant never treated him as being

the purchaser of the unit that was to go to Dr. Ghahremani.  As stated in Paragraph 8 of his Affidavit,

Mr. Davarya's testimony is as follows:

> Subsequent to December 13, 2002, I was never contacted by the developer or its
> agents in regard to the Langston Hughes Condominium Unit Purchase Agreement
> which I had signed along with Dr. Ghahremani or was otherwise treated by them as
> having any interest in that matter.

Thus, it was the Dr. Ghahremani and his wife who signed the contract amendments attached to the

Complaint and it was the Ghahremani's who chose the optional items for the unit and it Dr.

Ghahremani alone who was contacted to come to settlement.

There is No Parol Evidence Bar to Plaintiff's Position

As the Court knows, the parol evidence rule only bars understandings that were

contemporaneous or prior to the signing of the contract.  Sutton v. Banner Life Ins. Co. 686 A.2d

1045, 1050 (D.C. 1996)(Essentially, the parol evidence rule excludes proof of facts and subjective

intentions not shared by the parties and evidence of prior and contemporaneous agreements, unless

the terms of the agreement are ambiguous.)[5]

However, proof of the events and agreements subsequent to that date is not barred.  Not only

do the events which occurred after December 13, 2002,  survive a parol evidence rule attack, they

evidence the fact that the contract was affirmatively modified to eliminate Mr. Davarya as purchaser.

Lowey v. Watt,  221 U.S.App.D.C. 435, 448-449, 684 F.2d 957, 970-971 (1982) examines the

---

[5] Ironically, the parol evidence rule would apply to the *Amendment* to the contract
(Exhibit 3 to the Complaint).  It only shows Plaintiff and Defendant as the parties and thus
Defendant should not be permitted to use the earlier document to contradict the Amendment.

relationship between the parol evidence rule and the rules concerning later modifications of an

agreement as follows

> Under the parol evidence rule, "A binding integrated agreement discharges prior
> agreements to the extent that it is inconsistent with them." Restatement (Second) of
> Contracts s 213(1) (1981). However, it is always a preliminary question whether the
> parties intended that the later agreements be "integrated," and in making that
> determination a court may consult "all relevant evidence," see id. at comment b,
> including documents that predate *971 **449 the later agreement, see id. s 214. See
> 15 S. Williston, Contracts s 1826 at 486-487 (3d ed. W. Jaeger 1972) (extent to which
> later agreement rescinds earlier inconsistent promises is always a question of intent
> and interpretation); U.C.C. s 2-208(1) (**repeated performance of inconsistent
> promises may explain or modify an agreement**). Insofar as possible, the agreement
> must be interpreted to effectuate the principal purpose of the parties and to harmonize
> the parties' statements of intent. See Restatement (Second) of Contracts s 202(1), (5)
> (1981). (Emphasis added)

On this record the repeated performance of inconsistent promises - the Amendments, the

options package, the notice of settlement sent only to Dr. Ghahremani, and the failure to communicate

at all with Mr. Davarya about this contract - all demonstrate that the contract had been modified to

eliminate Mr. Davarya as the purchaser.

Because each of those acts took place subsequent to the execution of the contract, the parol

evidence rule offers Defendant no sanctuary.

The Contract Provision Upon Which Defendant Relies are Unconscionable
and Therefore Unenforceable

The District of Columbia has gone beyond the common law regarding unconscionability,

(although those equitable standards still apply in the District of Columbia), by adding "real estate"

to the Consumer Protection Procedures Act, §28-3901, D.C. Code (1981 ed.)(the "Act"), *et seq.* The

Court's indulgence is respectfully requested for the following extended presentation of the relevant

portions of the Act.

§ 28-3901(a) of the Act provides, in pertinent part as follows:

(2) "consumer" means a person who does or would purchase . . . receive consumer

11

goods or services . . . or a person who does or would provide the economic demand for a trade practice; as an adjective, "consumer" describes anything, without exception, which is primarily for personal, household, or family use;[6]

(3) "merchant" means a person who does or would sell . . . or transfer . . . consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice;[7]

\* \* \*

(7) "goods and services" means any and all parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes . . . **real estate** transactions. . . . (Emphasis added)

Based upon the foregoing definitions, the instant transaction clearly involves the sale and trade

practices that lead to the sale of real estate and therefore it is a transaction within the reach of the Act.

§28-3901(c) spells out the scope that a Court must give the Act as follows:

(c) This chapter shall be construed and applied liberally to promote its purpose.

Clearly conduct which offends the Act would be conduct that violates the public policy of the District

of Columbia.

The Act prohibits commercial misconduct in §28-3904, the relevant portions of which read

as follows:

It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:

\* \* \*

(e) misrepresent as to a material fact which has a tendency to mislead;[8]

---

[6] The subject real estate being residential in nature and intended by Dr. Ghahremani for a home, the subject transaction falls within the Act.

[7] Defendant Seller is clearly a "merchant."

[8] According to Defendant, its agent misrepresented her authority to make the promises which she made. This was material in that Dr. Ghahremani entrusted Defendant with the deposit money for more than two years on the strength of her representation.

(f) fail to state a material fact if such failure tends to mislead;[9]

\* \* \*

(r) make or enforce unconscionable terms or provisions of sales. . . ;  in applying this subsection, consideration shall be given to the following, and other factors:[10]

\* \* \*

(2) knowledge by the person at the time of the sale . . . of the inability of the consumer to receive substantial benefits from the property or services sold or leased;[11]

\* \* \*

(5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factor.[12]

Because the conduct of the Defendant violates the Act, it necessarily violates the public policy of the District of Columbia.  The Restatement (Second) of Contracts, §178, spells out the issues when a contract is challenged on public policy grounds, in relevant part,  as follows:

§ 178. When A Term Is Unenforceable On Grounds Of Public Policy
(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms. (Emphasis added)
(2) In weighing the interest in the enforcement of a term, account is taken of
(a) the parties' justified expectations,

---

[9] The failure to clearly advise potential purchasers of the fact that they were waiving all of their rights to enforce the contract would qualify as a material omission of a material fact.

[10] As shown herein, the terms which Plaintiff attacks in this action are clearly unconscionable.

[11] Clearly, Defendant is charged with the knowledge that its carefully crafted spider web could result in no benefit to the consumer.

[12] The provisions of the contract that Defendant seeks to enforce and which Plaintiff seeks to avoid are all dressed in the technical lingo of the real estate lawyer.  It is respectfully submitted that no layman would be able to discern the true nature of the significance of the waivers in the contract.  A jury could make such a finding and that fact, in and of itself, defeats the two Motions.

(b) any forfeiture that would result if enforcement were denied, and

(c) any special public interest in the enforcement of the particular term.

(3) In weighing a public policy against enforcement of a term, account is taken of

(a) the strength of that policy as manifested by legislation or judicial decisions,

(b) the likelihood that a refusal to enforce the term will further that policy,

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d) the directness of the connection between that misconduct and the term.

The record herein satisfies the requirements of §178.

The Contract in this action is a sham and operates as a fraud on the unwary. As stated in the Complaint:

> 18.    The actual reason for Uptown's unlawful actions is that the value of the Unit has gone up substantially since 2002 and Uptown can sell the Unit for more approximately twice the amount that the price shown in the Contract. The given excuses by Uptown for its unprincipled refusal to meet its contractual obligations are pretextual.

Faced with an unconscionable contract, a court need not take an all or none approach to the contract. The Court can simply refuse to enforce those elements of an unconscionable contract that make the contract unconscionable. The Court of Maryland treated this as a black letter rule of law by relying on §208 of the Restatement (Second) of Contracts, in <u>Williams v. Williams</u>, 306 Md. 332, 337, 508 A.2d 985, 998 (Md. 1986), as follows:

> The legal doctrine which [the trial judge] applied in his analysis below is currently labelled [sic] "unconscionability." The doctrine is recognized in the Restatement (Second) of Contracts, § 208, which reads:
>
>> § 208. Unconscionable Contract Or Term
>> If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or <u>may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.</u> (Emphasis added)

Adding up all of the provisions upon which Defendant relies in this matter the Court will discover that Defendant can apply the contract against Plaintiff but that Plaintiff cannot apply the

contract against Defendant. Every provision of the contract at issue here serves Defendant's interest. None serves Plaintiff's interest.

Without the intervention of equity, the contract is simply illusory and unenforceable which would result in exactly the inequitable result that Defendant is seeking in this action. Allowing the wrongdoer the benefit of the wrongdoing is never permitted. In <u>Retail Clerks Int'l v. NLRB,</u> 166 U.S.App.D.C. 422, 426, n15 510 2d. 802, 806 n15 (1075), the Court of Appeals discussed illusory contracts as follows:

> It is a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless. . . . The interpretation suggested by the Board would clearly make the employer's promise illusory since it would make compliance with the clause dependent on the 'mere will or inclination of the promisor. . . . Illusory promises are, of course, not enforceable.

The same rule appears in <u>Geiger v. Ryan's Family Steak Houses, Inc.</u>, 134 F.Supp.2d 985, 1000 (S.D. Ind. 2001):

> [T]he Sixth Circuit held that the arbitration agreement identical to the one at issue here contained an illusory promise by [one of the parties]. Specifically, the court concluded that [party's] "right to choose the nature of its performance renders its promise illusory." . . . Quoting Professor Williston, the court stated that: "Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement. The unlimited choice in effect destroys the promise and makes it merely illusory."

In sum, Dr. Ghahremani asks the Court to find that the very elements of the contract upon which Defendant depends to be so unfair that they shock the conscience of the Court. In <u>Mandley v. Backer,</u> 73 App.D.C. 412, 413, 121 F. 2d 875, 876 (1941), the Court held:

> To permit the trust to be repudiated and the evildoer to retain the fruits of his fraud would be wholly at a variance with the fundamental principles of equity. As was said by Chief Judge Stacy of the Supreme Court of North Carolina in <u>McNinch v. American Trust Co.</u>, supra (183 N.C. 33, 110 S.E. 665), in such cases it is not necessary that actual fraud be shown but only the establishment of such conduct and

bad faith on the part of the defendants as would shock the conscience of the chancellor. If appellant's complaint states the truth, and on this motion it must be assumed it does, 'it would be strange, indeed, if such conduct were beyond the reach of a court of equity'

The Claimed Necessary Party

Without careful examination of the facts, Defendant claims that the Complaint should be dismissed for the failure to add Dr. Farzad as an additional party Plaintiff. As show in Dr. Farzad's own Affidavit, he is not a necessary party. However, if Defendant feels that complete justice cannot be had without him, there is nothing that would prevent Defendant from filing an appropriate pleading to make him a party.

Conclusion

Based upon the foregoing, Plaintiff Saman Ghahremani respectfully requests that the Court deny both of Defendant's Motions.

Respectfully submitted,

/s/

_____

Robert N. Levin, Bar No. 79137
Robert N. Levin, PC
1901 Research Boulevard, Suite 400
Rockville, Maryland 20850
(301) 517-8727

G:\GHAHREMANI\pldg\dismissoppp&a.wpd

16