EXHIBIT A

# LANGSTON HUGHES CONDOMINIUM
## CONDOMINIUM UNIT PURCHASE AGREEMENT

THIS AGREEMENT is made this 13th day of Dec. 2002 (the "Effective Date"), being the date this Agreement is accepted by Seller, by and between Mario Taboada, Jacalin Irving (hereinafter known as the "Purchaser") and UPTOWN PARTNERS, L.L.C., a District of Columbia limited liability company (hereinafter known as the "Seller"). THE MAYHOOD COMPANY (hereinafter known as the "Agent") is acting as the agent of Seller in this transaction.

WHEREAS, Seller is the Declarant of LANGSTON HUGHES CONDOMINIUM (the "Condominium") located at 1390 V Street, N.W., Washington, D.C. 20009 pursuant to the provisions of Section 42-1901.01, et seq., of the District of Columbia Code, as amended (the "Condominium Act") and;

WHEREAS, the Purchaser wishes to purchase the Condominium Unit hereinafter described.

WITNESSETH:

That for and in consideration of a deposit (the "Deposit") by Purchaser in the sum of _____ Dollars ($ 13,000 ) by check subject to collection, the receipt and sufficiency of which are hereby acknowledged, Purchaser agrees to buy, and Seller agrees to sell, residential Condominium Unit 203 in the Condominium (the "Condominium Unit") and Parking Unit No. _____ in the Condominium (the "Parking Unit"). The Condominium Unit and the Parking Unit are sometimes hereinafter collectively referred to as the "Property".

All capitalized terms used without definition in this Agreement have the meanings specified for such terms in Section 42-1901.02 of the Condominium Act. All references to section numbers mean the sections of this Agreement unless otherwise specified.

Seller agrees to sell and Purchaser agrees to purchase the Property, together with an undivided interest in the Common Elements of the Condominium as set forth in Exhibit B to the Condominium Declaration, for the Purchase Price as shown in Paragraph 1 below.

1. **Basic Terms of Purchase.**

    (a) The Purchase Price for the Property shall be as follows:

    (i) Base sales price of Condominium Unit (includes General Specifications on Schedule A)  $ 259,900

    (ii) Sales Price of Parking Unit No. _____  $ —

    (iii) Options shown on the attached Schedule B  + $ —

    (iv) Purchase Price (exclusive of settlement costs, prorated amounts, homeowner association fees and contributions and prepaid items)  = $ 259,900

    (b) Such purchase price being payable by Purchaser as follows:

    (i) Earnest Money Deposit  $ 13,000

    (ii) Option Payments made for options shown on Schedule B (all Option Payments are made payable to the Seller and are non-refundable)  + $ —

    (iii) Mortgage proceeds (if any)  + $ 233,900

    (iv) Total of (b)(i), (ii) and (iii)  = $ 246,900

    (v) Balance of Purchase Price due at settlement (exclusive of settlement costs, prorated amounts of prepaid items)  $ 13,000

Seller acknowledges receipt of the Deposit. The Deposit will be held in an interest-bearing escrow account. The Deposit will be applied toward payment of the Balance Due and any interest earned on the Deposit will be paid or credited to Purchaser. If this Agreement is terminated for any reason, the Deposit (and all interest accrued thereon) will be paid to the person lawfully entitled to the Deposit under the terms of this Agreement.

Purchaser will also deposit with Seller at Settlement for transmittal to the Unit Owners Association (i) the monthly installment of the Common Expenses assessment against the Property, prorated to the date of settlement (see Paragraph 4(b)(iii) of this Agreement); and (ii) an initial working capital contribution in an amount equal to twice the monthly installment of the Common expense assessment against the Property (see Paragraph 4(b)(iii) of this Agreement), such amounts being common expense assessment against the Property (see Paragraph 4(b)(iii) of this Agreement), such amounts being in addition to and not in lieu of regular monthly installments of such assessments and charges as the same thereafter become due and payable. Such payments are non-refundable.

2. **Financing.**

195450-1

1

Purchaser hereby elects the following method of financing, pursuant to the terms of this Agreement:

(Purchaser to designate applicable financing):

　　　　No financing arrangement (all cash).

　　　　Financing arranged through lender of Purchaser's choice.

✓　　Financing arranged through lender(s) designated by Declarant ("Designated Lender(s)")

(a) **Cash or Purchaser's Lender.** If Purchaser elects to pay the Purchase Price all in cash, or if Purchaser elects to place a mortgage or deed of trust on the Property with a lender of Purchaser's choice, then this Agreement shall be in no way contingent upon Purchaser obtaining any financing and Purchaser assumes full responsibility to initiate and pursue all steps necessary to obtain the funds required for Settlement. Further, Purchaser shall provide Declarant, within fifteen (15) days after any request therefore, proof of Purchaser's financial ability to pay the balance due at settlement. If Purchaser fails to provide proof satisfactory to Declarant, Declarant at its sole option, may terminate this Agreement and cause the Deposit to be returned to Purchaser. If Purchaser fails to pay the Purchase Price due at settlement, then this Agreement, at the sole option of Declarant, may be terminated and the Deposit retained by Declarant.

(b) **Designated Lender.**

(i) **Introduction.** If Purchaser elects to obtain financing from a Designated Lender(s), then Purchaser shall place with such Designated Lender a mortgage or deed of trust on the Property in the amount of the mortgage proceeds set forth in Section 1(b)(iii) or such greater amount approved by the Designated Lender, paying interest at the prevailing market rate for such term and on the repayment schedule established by the Designated Lender's written commitment to Purchaser. Purchaser's credit will be subject to approval by the Designated Lender(s) making such mortgage loan.

(ii) **Loan Application.** Purchaser shall apply to the Designated Lender within ten (10) days after notice from the Declarant and shall, without delay provide to the Declarant or such lender such information or other materials as may be required by such Designated Lender. Purchaser shall provide Declarant within ten (10) days after any request therefore, proof of Purchaser's financial ability to pay the balance due at settlement. Purchaser shall complete all mortgage credit applications and other similar forms provided by the Designated Lender promptly after receipt, and if such forms are not submitted to the Designated Lender properly and fully executed within fifteen (15) days after the request for the same, then this Agreement, at the sole option of Declarant, may be terminated and the Deposit retained by Declarant. Purchaser shall comply with the terms of any commitment from the Designated Lender. If Purchaser has complied with the requirements of this Agreement and for any reason whatsoever is unable to obtain a commitment satisfactory to Declarant for the mortgage loan referred to above from a Designated Lender, Declarant shall have the sole option to terminate this Agreement and cause the Deposit to be returned to Purchaser. If the Designated Lender refused to make the loan due to the failure of Purchaser to comply with the terms and satisfy the conditions of any commitment, Declarant shall have the sole option to terminate this Agreement and Declarant may retain the Deposit and any accrued interest. In no event shall Declarant have any obligation or liability to Purchaser due to the lender's refusal to make such loan for any reason whatsoever, except that Declarant shall cause the Deposit to be returned to Purchaser, if due.

(c) **Other Financing.** If Purchaser elects to obtain financing from a Designated Lender(s), Purchaser may also seek financing from any other source until either a Designated Lender issues a commitment to Purchaser or Purchaser fails to pursue mortgage financing in compliance with paragraph (2) hereof. Purchaser must thereupon either accept the commitment offered by the Designated Lender or deliver to Declarant a copy of a commitment letter satisfactory to Declarant issued by the lender of Purchasers choice; otherwise, Declarant shall have the sole option to terminate this Agreement and retain the Deposit and any accrued interest.

(d) **Other Lenders.** If the Purchaser selects a Designated Lender and after truthful and diligent application is not approved by such Designated Lender, then the Purchase shall continue diligently to seek satisfaction of the financing contingency and the Declarant shall have the right, but not the obligation, to attempt to obtain a loan commitment as set forth above for the Purchaser. Should the Declarant obtain such a loan commitment, the Purchaser shall accept it and otherwise cooperate so as to effectuate the commitment. If the Purchaser cannot obtain a loan commitment after two applications made in good faith, then this Agreement may be terminated at the option of the Declarant, and all deposits paid by the Purchaser will be refunded. Should the Purchaser select his own lender and not receive a loan commitment within sixty (60) calendar days from the date of acceptance of this Agreement by Declarant, then the Declarant may, at its option, terminate this Agreement and refund the Purchaser's deposit.

The Declarant shall not be liable for damages or interest rate changes by reason of delays in the completion of the Property. This Agreement is not contingent on the sale of the Purchaser's house, and it is not contingent on the Purchaser being able to comply with any terms or conditions of any commitment obtained by him, such as the sale of other property for retirement of debt, unless such contingency is specifically hereinafter by addendum otherwise provided.

(e) **Lender's Fees.** The lender, whether selected by Purchaser or designated by Declarant, customarily will require a loan origination fee from Purchaser. All such fees charged by any lender shall be the responsibility of the Purchaser. If Purchaser chooses a Designated Lender, the Declarant shall pay $1,000.00 towards closing costs. All other fees are the responsibility of the Purchaser. When Purchaser elects to obtain financing from an institutional lender of Purchaser's choice, Declarant will pay no fees and Purchaser shall pay all lender's fees.

(f) **Credit Information.** The Purchaser specifically authorizes the Declarant to disclose to any lender any credit information provided to the Declarant by the Purchaser, and authorizes lender to order a credit report from a recognized credit reporting agency.

2

195450-1

(g) **Contingencies and Liability.** This Agreement is not contingent on Purchaser's ability to comply with any terms or conditions of any pre-qualification letter or commitment, such as the sale of Purchaser's house or other property or retirement of debt, unless such contingency is specifically provided for in an addendum to this Agreement. If Purchaser fails to notify Declarant immediately upon receipt of a denial of financing, all financing contingencies are automatically waived. Declarant is not liable for damages or interest rate changes caused by delays in completion or settlement.

3. **The Dwelling.**

(a) At settlement Seller will deliver the Property and the appurtenances thereto substantially in accordance with the Plats and Plans, as the same may be modified and amended from time to time and the standard finishings listed on the attached Schedule A. **SELLER SHALL HAVE THE ABSOLUTE RIGHT TO SUBSTITUTE MATERIALS, FIXTURES, EQUIPMENT, AND APPLIANCES WHICH SELLER DETERMINES TO BE OF SUBSTANTIALLY EQUAL QUALITY OR PERFORMANCE AS THOSE SPECIFIED IN THE PLANS OR INDICATED ON SCHEDULES A OR B.** Purchaser acknowledges that measurements shown on the Plats and Plans are approximate and actual dimensions may not be exactly as shown. Seller will not be required to install or provide any fixtures or appliances not actually installed in the Condominium Unit at the time of inspection as provided in Section 4 (c) unless otherwise agreed in writing to be installed by Seller. Seller shall have the right to make minor changes in the dimensions of any portion of the Condominium and to substitute materials, fixtures, equipment, and appliances of substantially equal quality as those specified in the Plats and Plans or other Condominium Instruments. Seller further reserves the right, but shall not be obligated, to make changes in construction as may be necessary from time to time due to the particular requirements of Purchaser's or Seller's mortgage lenders, the Veterans Administration, or any other governmental authority having jurisdiction over the Property, or as may be otherwise required by material shortages, work stoppages, emergencies, necessary changes to the Plats and Plans discovered in construction for reasons of impossibility, structural soundness, aesthetics, or by acts of God, labor disputes, fire or other casualty, Seller's inability to obtain materials and/or labor, extras, options, decorator selections, or to complete work requested by Purchaser and approved by Seller, zoning requirements and laws, governmental approvals of any kind, inclement weather, or any other similar or dissimilar causes or reasons beyond the reasonable or practical control of Seller. The parties expressly agree that any brochures or other materials regarding the Property, the Model or the Condominium containing artist's renditions, photographs, or drawings of any nature are not binding and are for demonstrative purposes only. Furniture, wallcoverings, furnishings or the like as shown in or about any model dwelling are for display purposes only and are not considered a part of such model or the Property for the purposes of this Agreement. Further, the location of wall switches, thermostats, chases, plumbing, electrical outlets and similar items may vary from dwelling to dwelling (including the Condominium Unit) and may not be as shown in any model dwelling. Any floor plans, sketches or sales drawings shown to Purchaser other than those which are a part of the Plats and Plans on file with the local governing authority are for display purposes only and may not be exactly duplicated. The Condominium Unit is being sold unfurnished and will contain only the appliances and equipment installed at the time of inspection of the Property by the Purchaser.

(b) Unless previously selected by Seller or a previous potential purchaser, Purchaser shall have the right to select items from Seller's list of available features to be provided by Seller in accordance with the policy applicable thereto prescribed by Seller. Options must be selected by Purchaser on or before thirty (30) days following written request by Seller. In the event that Purchaser shall fail to exercise its right to select options within the applicable time period, then Purchaser shall be in default under this Agreement, in which event (x) Seller shall have the right to select all finishes for the interior of the dwelling as Seller may determine and Purchaser shall be obligated to consummate its acquisition of the Property with such finishes as Seller shall have selected and the cost of the options selected by Seller shall be Purchaser's responsibility and added to the Purchase Price, or (y) Seller shall have the right to terminate this Agreement and upon such termination the Earnest Money Deposit and all Option Payments shall be forfeited to Seller and Seller shall have the right to exercise any other remedies available to Seller under Section 15(a) in the event of Purchaser's default, or (z) Seller may permit Purchaser to delay its selection of options. If Seller determines, in its sole discretion, that any options previously offered to Purchaser become unavailable or if Seller determines that the inclusion of such options is not feasible, either structurally or economically, then Seller shall have the right to withdraw such option and the Purchase Price shall be adjusted accordingly to reflect the deletion of the option.

4. **The Settlement.**

(a) Settlement on the purchase and sale of the Property (referred to herein as the "Settlement") shall occur on such date as designated by Seller in a notice ("Settlement Notice") given to Purchaser at least ten (10) days in advance of such date stating that Seller is prepared to tender title and possession of the Property to Purchaser. Seller agrees that said Settlement Notice will not be given prior to the time the recision period under paragraph 21 expires. Time is of the essence with respect to Purchaser's obligation to complete settlement on such date. Purchaser shall pay to Seller at Settlement by certified or cashier's check the unpaid balance of the Purchase Price and all other sums payable to Seller hereunder, and Seller shall deliver to Purchaser a Special Warranty Deed, duly executed by Seller, sufficient to convey title to the Property to Purchaser. Equitable title shall remain vested in the Seller until delivery of the deed.

(b)(i) **CHOICE OF SETTLEMENT AGENT.** THE PURCHASER HAS A RIGHT TO SELECT ANY SETTLEMENT AGENT TO HANDLE THE CLOSING OF THIS TRANSACTION. THE SETTLEMENT AGENT'S ROLE IN CLOSING YOUR TRANSACTION INVOLVES THE COORDINATION OF NUMEROUS ADMINISTRATIVE AND CLERICAL FUNCTIONS RELATING TO THE COLLECTION OF DOCUMENTS AND THE COLLECTION AND DISBURSEMENT OF FUNDS REQUIRED TO CARRY OUT THE TERMS OF THE CONTRACT BETWEEN THE PARTIES. IF PART OF THE PURCHASE PRICE IS FINANCED, YOUR LENDER WILL INSTRUCT THE SETTLEMENT AGENT AS TO THE SIGNING AND RECORDING OF LOAN DOCUMENTS AND THE DISBURSEMENT OF LOAN PROCEEDS.

(ii) **Settlement Costs and Expenses.** If Settlement is made by such attorneys or agents as Seller may designate, then Seller shall pay the cost of examination of title, the District of Columbia Real Property Transfer Tax on the deed consideration, and the settlement fee charged by the settlement attorney or title company for conducting Settlement (excluding any charges by Purchaser's attorney). Purchaser shall reimburse Seller at settlement for prepaid real estate taxes, assessments and water and utility charges, if any, on the Property, all of which shall be adjusted as of date of Settlement. If Settlement is made by an attorney or agent other than the the title company or settlement agent designated by

3

195450-1

Case 1:05-cv-01270-CKK    Document 6-3    Filed 09/06/2005    Page 5 of 11

Seller, then Seller will pay only the District of Columbia Real Property Transfer Tax on the deed consideration, and all other costs, fees and charges shall be paid by Purchaser, it being understood and agreed that Seller shall not be responsible for any costs of preparation of the deed or any other documents, the recordation costs for any such documents, courier/messenger fees, delivery charges, title examination fees, commitment or binder preparation fees, settlement fees, notary fees, or any other charges of any nature assessed by the attorney, title company or settlement agent selected by Purchaser to conduct Settlement under this Agreement or by any governmental authority, and that Purchaser shall be responsible for the payment of all such costs.

In all cases, regardless of the attorney, title company, or settlement agent conducting Settlement under this Agreement, and regardless of whether Purchaser has elected to pay cash pursuant to Section 2, or to obtain financing from a Designated Lender or a non-Designated Lender, Purchaser shall be solely responsible for all owner's and lender's title insurance premiums, mortgage insurance premiums, if any, final survey costs (Seller will provide a location survey of the Property to the settlement agent at closing for which Purchaser will reimburse Seller), termite inspection/soil treatment report fees (Seller will provide a termite/soil treatment certificate for the Property to the settlement agent at closing for which Purchaser will reimburse Seller), as well as for any fees or costs assessed by the lender, including, but not limited to, loan placement fees, lender's counsel fees or document preparation or review fees, and Purchaser shall also be responsible for the payment of all title insurance company or settlement agent and lender delivery and messenger fees, notary fees, title commitment or binder preparation fees, title company (or related law firm) charges or document preparation fees, Purchaser's attorney's fees, lender inspection fees, tax service fees, all conveyancing and recording fees, recordation taxes on the deed and any purchase money deed of trust or other deed of trust (including, without limitation, the District of Columbia Real Property Recordation Tax), preparation of trust, note and/or power of attorney, insurance and tax escrows, and prepaid items required by the lender.

(iii) **Prepayments and Escrows.** If required by the lender, Purchaser shall prepay at settlement any mortgage insurance premiums and a percentage of the estimated annual real estate taxes and hazard insurance premiums. If a final real estate tax bill has not been issued for the Property prior to settlement, Purchaser shall comply with such arrangements as may be established by Seller to assure payment of such taxes; any supplemental taxes shall also be prorated to the date of Settlement. The monthly Common Expenses assessment against the Property, as well as all rents, taxes, insurance, and water, sewer and operating charges are to be adjusted to the date of Settlement. Real estate taxes, general and special, are to be adjusted according to the District of Columbia certificate of taxes, except that assessments for improvements completed prior to the date of this Agreement (other than any existing dwelling being purchased hereunder), whether assessment therefor has been levied or not, shall be paid by the Seller, or allowance made therefor at the time of Settlement. Real estate taxes, which are subject to yearly reassessment by the District of Columbia, will be billed directly to the unit owner by the District of Columbia. Direct billing may not begin until the next tax year following the tax year in which settlement occurs and Seller may continue to be billed for real estate taxes based on an assessment of the existing tax parcels in the Condominium. If settlement on the Condominium unit occurs before an individual tax bill for the unit has been issued, Purchaser will be required to reimburse the Seller at settlement for the amount of taxes attributable to the unit being conveyed, pro-rated from the date of settlement to the end of the tax year. In the event that at the time of Settlement any such item has not been allocated among the units, the total of said items for the Property shall be allocated among the units (on an estimated basis, if necessary in accordance with each unit's undivided interest in the Common Elements of the Condominium as set forth in Exhibit B to the Condominium Declaration).

(iv) **Working Capital Assessment.** In addition to all other expenses of closing Purchaser agrees to pay a non-refundable contribution to the initial working capital of the Condominium in the amount set forth in Exhibit V-B to the Public Offering Statement. This sum is equal to two (2) months estimated assessments for the Property as of the date of settlement. The working capital contribution will be in addition to and not in lieu of any assessments imposed thereafter by the Unit Owners Association.

(c) Seller shall afford Purchaser an opportunity prior to Settlement to "walk-through" the Property and to develop jointly with Seller a final and complete "punch list" on the Unit Inspection Form. Seller shall remedy such "punch list" items as soon thereafter as reasonably practicable, but failure to remedy such items by the date scheduled for Settlement shall not postpone Settlement or permit Purchaser to refuse to settle. It is further agreed that there shall be no withholding of Seller's funds or any part thereof at Settlement on account of any such "punch list" items on the Unit Inspection Form. Seller shall notify Purchaser within five (5) days prior to Settlement of the date and time that the Property will be ready for inspection. At such inspection, the Unit Inspection Form shall be completed and executed by Purchaser and by a representative of Seller. Purchaser shall attend such inspection and participate in completing the Unit Inspection Form prior to settlement. Failure of Purchaser to make the inspection at the date and time specified by Seller shall constitute full acceptance of the Property by Purchaser. Upon acceptance of the deed by Purchaser, Purchaser agrees to hold Seller free from liability for any visible defects not specifically noted in said Unit Inspection Form.

(d) At Settlement, Seller shall execute and deliver all documents necessary to effect and complete the Settlement, including but not limited to (i) a special warranty deed sufficient to convey fee simple title to the Property as herein provided, and (ii) the settlement statement.

(e) At Settlement, Purchaser shall execute and deliver all documents and all funds necessary to complete Settlement, including, but not limited to (i) the remainder of the Purchase Price and all settlement costs due from Purchaser; (ii) the Settlement Statement; and (iii) all mortgage and title company documents required by the lender or title company.

(f) This Agreement is a single, indivisible contract and the delivery to and acceptance of the deed by Purchaser shall be deemed and considered as full performance and compliance by Seller of all the terms of this Agreement, and as a release by Purchaser of any and all rights, obligations, claims, or causes of action against Seller.

5. **Agent.**

(a) Seller and Purchaser acknowledge that this Agreement was procured through the services of Seller's Agent without the intervention of any other cooperating broker, except as expressly recognized elsewhere herein on the date of Purchaser's execution of this Agreement. Purchaser shall indemnify Seller against the claim of any other broker, including any attorney's fees incurred as a result of such claim. Seller hereby recognizes Agent as the agent responsible for procuring this transaction, and Seller agrees to pay Agent a sales commission upon, and only upon, the consummation of Settlement and recordation of the deed pursuant to this Agreement, pursuant to a separate agreement between Agent and Seller. This sales commission shall not be deemed earned or payable until the completion of Settlement hereunder and recordation of the deed from Seller to Purchaser. Seller hereby authorizes and directs the settlement attorney to pay such commission from its proceeds at settlement.

Acknowledgment: Agent and any other agent to this transaction recognizes and agrees that no commission is due hereunder unless and until this sale is consummated by settlement and all funds are collected. Failure to consummate the sale for any reason will relieve Seller of and from any obligation to any agent or broker, co-op or otherwise, for any commission or otherwise.

(b) Purchaser recognizes that Agent receives all information as to Seller's projected completion date from Seller and that in this regard Agent is merely acting as a conduit of information and not in any respect as Agent of Seller. Agent shall not be responsible in any manner whatsoever to Purchaser for failure or inability of Seller to meet Seller's projected completion date, it being agreed that Purchaser shall look solely to Seller in this regard. Purchaser acknowledges and agrees that Seller shall not be responsible for any misinformation given by Agent or any co-op broker. The co-op broker has no authority, apparent or actual, to act on behalf of Seller.

6. **Risk of Loss.**

Seller assumes the risk of loss or damage to the Property by fire or other casualty until Settlement occurs as provided in this Agreement.

7. **Title.**

(a) The Property shall be sold free of monetary encumbrances, except as otherwise provided herein. Title at Settlement is to be good of record and fully insurable by a title insurance company at regular rates, subject, however, to the terms and conditions of the Condominium Act, the Condominium Instruments, covenants, easements, rights-of-way, conditions and restrictions of record, such other restrictions as are specifically set forth herein, ordinances and regulations of municipal or other governmental authorities, any other matters or easements which may be observed by an inspection of the Property, purchaser's deed of trust, and to liens or other matters over which the title company agrees to insure.

(b) If title to the Property cannot be so conveyed to Purchaser at Settlement for any reason whatsoever, including, but not limited to, the filing by third parties of any impediments to title, the Deposit and all interest accrued thereon, if any, shall be returned and this Agreement shall be declared null and void at the option of Purchaser or Seller, unless the defects are of such character that they may be remedied by Seller and **only if Seller elects to undertake to cure such defects**. Seller and its Agent are hereby expressly released from any and all liability for damages by reason of any defect in the title. In the event that legal steps are necessary to perfect the title, such action, if Seller elects to undertake the same, will be taken promptly by and at Seller's expense, whereupon the time herein specified for full settlement by Purchaser shall be extended for the period necessary for such action, but not to exceed twelve (12) additional months.

(c) The Property is sold subject to easements, if any, created or to be created, prior to or after Settlement, in favor of utility companies, municipal authorities, or quasi-governmental authorities for the installation of utilities or street lights or roads and/or additional covenants, rights-of-way, conditions, restrictions or easements which may be placed of record by Seller after the effective date of this Agreement for the benefit of the Property and/or the community of which it is a part. This Agreement shall be subordinate to any such easements, rights-of-way, covenants, conditions and restrictions of record. If such easements, rights-of-way, covenants, conditions or restrictions are placed of record after Settlement and recordation of the deed, Purchaser shall, and does hereby agree to, subject the Property to all such easements, rights-of-way, covenants, conditions and restrictions and subordinate Purchaser's fee interest therein to all of same.

8. **Occupancy.**

(a) Occupancy hereunder shall be given to Purchaser after Settlement.

(b) Notwithstanding Purchaser's occupancy as aforesaid, Seller shall have the right to enter upon the Property at any time before or after Settlement for the purpose of making exterior changes to the Property or the Condominium, including, but not limited to, changes as may be required by Seller's site plan, the Plat and Plans or any modifications thereof, or any changes which may be required as a condition of Seller's release by applicable governmental authorities from any and all subdivision or site plan bonds or other escrows.

9. **Delay.** (a) Purchaser's Option. If settlement shall not have occurred within twenty-four (24) months after execution of this Agreement due to reasons within Seller's control, Purchaser shall have the option of either: (i) terminating this Agreement by written notice to Seller, delivered at any time prior to Seller's establishment of a settlement date, in which event Seller shall, if Purchaser shall not then be in default, cause the Deposit (and all other money paid to Seller by Purchaser hereunder, if any) to be returned to Purchaser, and neither party shall have any further liability or obligation hereunder; or (ii) electing to proceed with the purchase of the Property when the same is completed.

(b) **Force Majeure.** If Seller is delayed in completing and settling on the Unit for reasons beyond the control of Seller, then the time for completion and settlement shall be extended for the period of such delay. Reasons beyond the control of Seller shall include, without limitation, impossibility of performance, acts of God, fire, earthquake, flood, explosion, condemnation or acts of governmental agencies asserting jurisdiction over the Condominium, and any other legally supportable justification under the laws of the District of Columbia which would excuse Seller from completing and settling on the Unit within the period allowed in Section 9(a).

5

195450-1

10. **Unsold Properties.**

Until such time as all of the Units in the Condominium are sold, Seller reserves the right to make such use of any unsold Units, the Common Elements, the streets and the main entrance of the project as is necessary for its sales and construction program and equipment storage. Purchaser recognizes, acknowledges and agrees that, in order to accomplish Seller's construction program, trucks, construction equipment, personnel, and noise and other inconveniences attendant thereto may be present. Purchaser consents thereto, and Purchaser agrees not to obstruct or impede any such construction or sales activities.

11. **Access.**

Purchaser shall not have access or entry to the Property or the construction site during construction, nor may Purchaser store any of Purchaser's possessions in or about the Property or construction site prior to the Settlement under this Agreement and delivery of possession to Purchaser hereunder. Any violation of this provision shall, at the election of the Seller, be a material breach of this Agreement, and in addition to any other remedies available to Seller, Seller may declare this Agreement null and void. In such event, any amount paid toward the Purchase Price, including, but not limited to, the Deposit and any payment for any options, extras or decorator selections, may be retained by Seller as fixed and liquidated damages. Purchaser and Seller acknowledge and agree that the aforesaid liquidated damages are not a penalty, but represent the best and most reasonable estimate of the actual damages which Seller shall sustain upon any breach by Purchaser of the prohibition of this Paragraph 11. Furthermore, the parties hereto agree that Seller shall not be responsible for personal injury or property damage to Purchaser or Purchaser's agents from Purchaser's violation of the prohibitions of this paragraph, nor shall Seller be responsible for personal injury or property damage arising at any time from any and all environmental or ecological conditions or by-products thereof, including, but not limited to, radon or hazardous waste.

12. **Location.**

The location, area, and ground elevation of the Condominium, the elevation of the Property, and the revision of the Plat and Plans, if necessary, as required by any governing body or governmental authority to conform to the existing property contours, are to be determined by Seller in its sole and absolute discretion.

13. **Models and Displays.**

It is hereby agreed that all furniture and appurtenant property, non-standard appliances, furnishings, non-standard fixtures, non-standard carpeting and floor tile, non-standard mirrors, built-ins, wallpaper, window decorating treatments, special trees, shrubbery, landscaping, and other decorator features exhibited in the model units and model area are for exhibition purposes only and are not included in the Purchase Price, unless otherwise expressly provided herein.

14. **Warranties.**

AT SETTLEMENT, SELLER WILL DELIVER TO PURCHASER AN EXECUTED COPY OF THE LIMITED WARRANTY IN THE FORM SET FORTH IN THE CONDOMINIUM INSTRUMENTS. UNLESS SPECIFIED OTHERWISE HEREIN, ALL WARRANTIES OTHER THAN THOSE EXPRESSLY PROVIDED IN THE LIMITED WARRANTY IN THE CONDOMINIUM INSTRUMENTS ARE HEREBY EXCLUDED. PURCHASER HAS BEEN AFFORDED THE OPPORTUNITY TO REVIEW THE LIMITED WARRANTY PRIOR TO EXECUTION OF THIS AGREEMENT, AND AGREES TO ACCEPT THIS WARRANTY AS THE SOLE WARRANTY BEING GIVEN BY SELLER TO PURCHASER. SELLER MAKES NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, BY STATUTE OR OTHERWISE, TO PURCHASER. SELLER SHALL NOT BE LIABLE FOR PERSONAL INJURY OR PROPERTY DAMAGE DUE TO OR ARISING FROM ENVIRONMENTAL OR ECOLOGICAL CONDITIONS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, NO WARRANTY IS HEREBY GIVEN OR TO BE IMPLIED HEREFROM OR OTHERWISE. AFTER SETTLEMENT, PURCHASER AGREES THAT SELLER SHALL NOT BE LIABLE FOR ANY WORK, WHETHER OR NOT PATENTLY INCOMPLETE, OR ANY DEFECTS NOT SPECIFICALLY NOTED IN THE PRE-SETTLEMENT UNIT INSPECTION FORM, UNLESS OTHERWISE SPECIFICALLY PROVIDED IN THE LIMITED WARRANTY. IT IS FURTHER AGREED THAT THERE SHALL BE NO WITHHOLDING OF SELLER'S FUNDS OR ANY PART THEREOF AT SETTLEMENT FOR ANY SUCH ITEMS.

15. **Default By Either Party.**

(a) In the event that Purchaser defaults in any of Purchaser's obligations under this Agreement, or fails to perform its obligations in the time period set forth in this Agreement, or in the event that Purchaser fails to make full Settlement hereunder as hereby required and at the time set forth in the Settlement Notice, the Earnest Money Deposit and all interest accrued thereon, if any, shall be forfeited as liquidated damages (in which event Purchaser shall be relieved from further liability hereunder), unless Seller notifies Purchaser and Agent in writing within thirty (30) days after the date provided for Settlement herein of its election to avail itself of any legal or equitable rights, other than the said liquidated damages, which Seller may have under this Agreement. It is acknowledged and agreed by Seller and Purchaser that the aforesaid liquidated damages are not a penalty, but represent the best and most reasonable estimate of the parties hereto of the actual damages which Seller shall sustain upon any default by Purchaser, which damages are not capable of precise determination. In the event that Seller permits Purchaser to defer Settlement to a date subsequent to the date set forth in the Settlement Notice, then Purchaser shall pay to Seller at Settlement a late charge in an amount equal to Two Hundred Dollars ($200) per day for each day following the date set forth in the Settlement Notice that Settlement does not occur, until the actual day of Settlement.

(b) In the event that this Agreement is breached by Seller, Purchaser shall have as its sole and exclusive remedy the right to terminate this Agreement by giving prompt written notice thereof to Seller, and Seller, upon receipt of such notice, shall forthwith return to Purchaser all sums theretofore paid by Purchaser to Seller as Purchaser's sole and complete remedy on account of any and all such defaults. No other damages, rights or remedies (whether or not Purchaser shall elect to terminate this Agreement) shall in any case be collectible, enforceable or available to Purchaser, and Purchaser

6

195450-1

agrees to accept and take the liquidated damages as Purchaser's sole damages and relief hereunder in such event. In consideration of the liquidated damages paid to Purchaser by Seller under this Agreement, the sufficiency of which is hereby acknowledged, Purchaser hereby expressly waives any and all rights Purchaser may have to enforce this Agreement by specific performance or to obtain any other equitable relief against Seller and to any further damages or other relief.

16. **District of Columbia Soil Disclosure Requirement.**

    Purchaser confirms that Seller has advised it, pursuant to Title 42, Section 608 of the District of Columbia Code, that the soil on the subject lands is noted in the Soil Survey of the District of Columbia as Urban Land, with the following characteristics: "nearly level to moderately sloping areas, most of which are occupied by structures and works; on all landscape positions."

    Purchaser has been advised that it may obtain further information in this regard by engaging a soil testing laboratory, the D.C. Department of Environmental Services, or the Soil Conservation Service of the U.S. Department of Agriculture. Nothing herein shall constitute a representation or warranty by the Seller as to the soil characteristics of the subject property.

17. **Condominium Assessments.**

    (a) Purchaser acknowledges that Purchaser has been fully advised that the Property is part of a Condominium organized under the District of Columbia Condominium Act of 1976, as amended, and that upon taking the title to the Property, Purchaser will have a continuing monthly obligation to pay in advance, when assessed by the Unit Owners Association, a share of the Common Expenses of operating and maintaining the Condominium, as indicated in Condominium Instruments. The assessment will be based on the budget adopted from time to time by the Association. The projected budget for the first year of operation of the Condominium and a table of initial estimated monthly assessments is included in the Public Offering Statement. The projected budget is believed to be reasonably accurate, but no warranty is made or intended that the budget will not be increased either before or after settlement, nor may one be relied upon. The estimated assessment does not include real estate taxes on the Property.

    (b) The phrase "Initial Operating Period," as used in this Agreement, means the period of time ending on the earliest to occur of (a) that date which is ninety (90) days following the date that Condominium Units to which 75% of the Percentage Interests appertain have been conveyed by the Seller, (b) one (1) year following the date that the first Unit is conveyed to a purchaser, or (c) on such earlier date as the Seller in its sole discretion may determine. During the Initial Operating Period, (i) the Seller shall pay the costs of operating the Condominium, and (ii) the Purchaser, in lieu of a condominium assessment against the Unit for common expenses, shall pay Seller a fee in an amount equal to 86% of the Unit's estimated monthly condominium fee for each month (or portion of a month on a pro rata basis) during the Initial Operating Period that the Purchaser owns the Unit. The Seller shall not be obligated to fund or otherwise contribute to any capital or other reserve for the Condominium during the Initial Operating Period.

18. **Special Declarant's Rights.**

    (a) **Title to Unsold Condominium Units.** Seller will retain or acquire title to each Condominium Unit not sold to any other Person. Seller retains the right to enter into leases with any third parties for the occupancy of any Condominium Unit so retained or acquired by Seller and not sold to any other Person.

    (b) **Easement for Sale.** Until such time as all of the Condominium Units are sold, Seller reserves the right to make such use of unsold Condominium Units and such of the Common Elements of the Condominium including the related amenities and facilities and parking spaces, as are necessary for Seller's sales program.

19. **Pre-Sale Requirement.**

    It is acknowledged by Purchaser that in connection with financing, loan guarantees or secondary mortgage market financing approved or which may be approved for the Condominium (such as may be provided by a Designated Lender, the Federal Housing Administration, the Veteran's Administration or the Federal National Mortgage Association) Seller may have to meet certain pre-sale requirements before conveying the Condominium or any portion of the Condominium. If Seller is unable to satisfy the pre-sale requirements specified by any such lender or agency, then Seller may by notice in writing to Purchaser terminate this Agreement, whereupon Seller will return the Deposit to Purchaser. Upon such termination neither of the parties hereto will have any further liability or obligation to the other hereunder, even if Seller later proceeds with the Condominium. Seller's liability for any damages to Purchaser hereunder will be solely limited to the refund of the Earnest Money Deposit.

20. **Underground Storage Tank Disclosure.** In accordance with the requirements of the D.C. Underground Storage Tank Management Act of 1990, as amended by the District of Columbia Underground Storage Tank Management Act of 1990 Amendment Act of 1992 (D.C. Code 8-113.01 et seq.) (the "Act") and the D.C. Underground Storage Tank Regulations, 20 DCMR Chapters 55-70 (the "Regulations"), Seller hereby informs Purchaser that Seller has no knowledge of the existence or removal during Seller's ownership of the Property of any "underground storage tanks" as that term is defined in the Act and the Regulations, except for the removal of one underground storage tank (with the capacity of gallons for gasoline) in compliance with the requirements of the Act and the Regulations. Information pertaining to underground storage tanks and underground storage tank removals of which the D.C. Government has received notification is on file with the D.C. Department of Consumer and Regulatory Affairs, Environmental Regulation Administration, Underground Storage Tank Branch, 2100 Martin Luther King, Jr. Avenue, S.E., Washington, D.C. , telephone (202) 404-1167.

21. **Post-Closing Disputes.** All questions, differences, disputes and controversies arising under this Agreement or with respect to the Property, the construction of the dwelling, or otherwise, after Settlement shall, if the parties cannot amicably resolve the matter, be settled by the architect of the Condominium. Either party may appeal the decision of the architect to arbitration. Such arbitration shall be conducted at the request of Seller or Purchaser before three arbitrators

195450-1

7

(unless the parties agree to one arbitrator) designated as follows: The party requesting the arbitration shall designate in writing, within ten (10) days of such request, the name of an arbitrator who is knowledgeable in the issues which are the subject of the arbitration, and the other party shall make a similar designation within the same period of time. Within fifteen (15) days after the designation as aforesaid, the two arbitrators shall select and designate a third arbitrator. The arbitrators designated shall make their award in strict conformity with generally accepted rules of arbitration in effect in the District of Columbia and shall have no power to depart from or change any of the provisions thereof. Any such arbitration award shall be binding upon the parties and enforceable by any court exercising jurisdiction over the parties. The expense of arbitration proceedings conducted hereunder (other than witness fees and attorneys' fees) shall be divided equally between the disputing parties. All arbitration proceedings hereunder shall be conducted in the District of Columbia.

22. **Miscellaneous.**

(a) The parties to this Agreement mutually agree that this Agreement shall be binding upon them, and each of their respective heirs, executors, administrators, successors and assigns; provided, however, that Purchaser shall have no right to assign this Agreement without the prior written consent of Seller. Any purported assignment of this Agreement by Purchaser in violation hereof shall be voidable at the option of Seller. Seller's refusal to consent to an assignment hereof shall not entitle Purchaser to terminate this Agreement or give rise to any claims for damages against Seller. Seller may assign its rights hereunder.

(b) Except for those provisions of Paragraphs 3, 4(c), 5(b), 7(c), 8(b), 9, 10, 12, 13, 14, 15, 16, 17, 18, 20, 21 and 22, which are for the benefit of Seller (which shall survive the Settlement hereunder), the terms and provisions of this Agreement shall not survive the Settlement hereunder. Purchaser's acceptance of delivery at Settlement shall relieve Seller of any further obligation under this Agreement.

(c) Purchaser is expressly prohibited from recording, and covenants not to record, this Agreement, any memorandum thereof or any lis pendens, whether or not Seller is at any time in default hereof, and upon any recordation or attempted recordation, Purchaser shall be in default of this Agreement, and Seller shall have all rights and remedies to which it is entitled pursuant to Paragraph 15(a) hereof with respect to such default. It is acknowledged and agreed by Purchaser and Seller that the aforesaid liquidated damages are not a penalty. Seller is empowered hereunder to seek immediate and summary injunctive relief against Purchaser if Purchaser places any impediment to title among the land records, together with costs and attorney's fees incurred by Seller in connection therewith.

(d) This Agreement and its addenda, if any, contains the final and entire agreement between the parties hereto, and the parties hereto shall not be bound by any terms, conditions, statements, warranties, or representations, oral or written, not herein contained. Purchaser agrees that Purchaser will rely only upon representations set forth in this Agreement. No action or inaction by Seller shall constitute a waiver of any default or obligation under this Agreement and no waiver of any default or obligation shall be effective unless it is in writing and signed by Seller.

(e) This Agreement is not severable except with the prior written consent of Seller. If any part of this Agreement is unenforceable or severed for any reason, then at Seller's election this Agreement may be terminated upon written notice to Purchaser and upon such termination Seller shall return Purchaser's Deposit and any other monies paid Seller hereunder and not then expended in connection with the Property, in which event the parties hereto shall be relieved of any and all further liability hereunder.

(f) Purchaser acknowledges that Purchaser has read and understands the terms and conditions set forth in Paragraphs 1 through 24 hereof, on the face and reverse of this form, and that Purchaser and Seller are bound by the terms hereof.

(g) Typewritten or handwritten language added to the printed contractual form (excluding addenda) is added for clarification only. In no event shall such additional typewritten or handwritten material take precedence over the printed form (excluding addenda). In the event of any ambiguity or inconsistency between the printed form and the handwritten or typewritten additions, the printed form shall take precedence.

(h) PURCHASER HEREBY REPRESENTS AND WARRANTS THAT PURCHASER INTENDS TO OCCUPY THE PROPERTY AS A PRIMARY RESIDENCE. ANY MISREPRESENTATION REGARDING PURCHASER'S INTENTION TO RESIDE IN THE UNIT SHALL CONSTITUTE A DEFAULT BY PURCHASER PURSUANT TO PARAGRAPH 15(a) HEREOF.

(i) If this Agreement is signed by an individual who is unmarried at the time of execution hereof, and at the time of Settlement such individual is then married, Purchaser shall indemnify Seller from any loss that may arise by reason of failure of Purchaser's spouse to execute any applications, mortgages, notes or other documents required by the lender. If Purchaser is married and Purchaser's spouse is not also a purchaser under this Agreement, then Purchaser shall be responsible for such spouse executing the mortgage loan documents required by the lender and the failure of such spouse to do so shall not release Purchaser from any obligations under this Agreement.

(j) The term "mortgages" as used herein shall include deeds of trust and vice versa.

(k) All notices required or permitted herein shall be in writing and effective as of the date on which such notice is mailed in any United States Post Office by first-class mail, postage prepaid, or hand-delivered to the person to whom such notice is directed at the address designated herein, or to such other address as the parties may designate in writing from time to time.

(l) This Agreement may be executed in counterparts, and all such counterparts shall be deemed to constitute one and the same Agreement, notwithstanding that all parties are not signatures to the same counterpart.

(m) ALL FUNDS TO BE DELIVERED BY PURCHASER UNDER THIS AGREEMENT SHALL BE IN THE FORM OF GOOD, IMMEDIATELY AVAILABLE FUNDS. IF FOR ANY REASON A CHECK IS RETURNED FOR INSUFFICIENT FUNDS OR OTHERWISE NOT HONORED BY THE INSTITUTION UPON WHICH IT IS DRAWN, THEN PURCHASER

8

195450-1

SHALL BE IN DEFAULT UNDER THIS AGREEMENT AND SELLER SHALL HAVE THE RIGHT TO EXERCISE ANY AND ALL RIGHTS AND REMEDIES IT MAY HAVE UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, TERMINATION OF THIS AGREEMENT AND RETENTION OF ALL FUNDS RECEIVED TO THE DATE OF TERMINATION IF THE DISHONORED CHECK IS NOT REPLACED BY IMMEDIATELY AVAILABLE FUNDS IN THE FORM OF WIRE TRANSFER FUNDS, CERTIFIED CHECK OR CASHIER'S CHECK DELIVERED TO SELLER WITHIN TWO BUSINESS DAYS AFTER PURCHASER IS NOTIFIED OF THE DISHONOR OF HIS OR HER CHECK.

(n) Any delay by Seller in its exercise of any right to terminate this Agreement under the terms provided in this Agreement shall not constitute a waiver of Seller's right to terminate this Agreement at any time thereafter.

(o) If for any reason Seller accepts one or more promissory notes from Purchaser for any portion of the Earnest Money Deposit, and any payment under any such promissory note is not made strictly in accordance with the terms of said promissory notes, then Purchaser shall be in default under this Agreement, in which event Seller shall have the right, at its sole option, to (i) terminate this Agreement and retain the entire Earnest Money Deposit and all Option Payments made to date, and (iii) exercise any other remedies available to Seller under Section 15(a) of this Agreement in the event of Purchaser's default.

(p) All amounts shown on any summary of costs are subject to final verification and audit and should any mathematical errors be determined upon verification, or any computations prove to be incorrect (i.e., an addition error in calculating the aggregate amount of options selected or the addition of the options to the Base Purchase Price), the parties agree to promptly execute an addendum to this Agreement to correct such errors and if any additional sums are required to be paid by Purchaser based upon such corrections, then Purchaser shall promptly pay such amount, or if a refund is due to Purchaser, Seller shall cause such refund to be promptly made to Purchaser.

(q) This Agreement shall be governed by the laws of the District of Columbia and the terms and provisions of this Agreement shall be interpreted and construed in accordance with said laws of the District of Columbia.

23. **Condominium Instruments.**

(a) Purchaser hereby acknowledges that Purchaser has received a copy of the Public Offering Statement, including the Declaration, the Bylaws of the Units Owners Association and related documents (collectively, the "Condominium Instruments"). Purchaser agrees to be bound by the provisions of the Condominium Instruments and any amendment to the Condominium Instruments which may later be adopted. Purchaser agrees to return the copy of the Public Offering Statement should this Agreement be terminated for any reason.

(b) Seller reserves the right, upon notice to Purchaser, prior to settlement hereunder, to make such modifications, additions or deletions in or to any of the Condominium Instruments as may be approved or required by any permanent lender, secondary mortgage market agency, public authorities or the title company insuring title, provided that none of the same will: (i) change the Common Element Interest of the Condominium Unit in the Common Elements of the Condominium as fixed in the Declaration (other than as permitted by the Declaration and the Condominium Act) or increase the proportion of the Common Expenses to be borne by the Condominium Unit being sold hereunder, (ii) increase the Total Purchase Price hereunder, (iii) require a material physical modification of the layout or location of the Property, or (iv) decrease the financial obligations of Seller hereunder.

24. **Purchaser's Right to Cancel**

(a) Seller hereby grants to purchaser a period of 15 days within which to review the Condominium documents made available to Purchaser pursuant to the District of Columbia Condominium Act of 1976, as amended, and applicable regulations. Notwithstanding any other provision of this Agreement, the Purchaser, at his election, by written notice to the Seller or Seller's agent, sent by registered mail (or personal delivery to the Seller's or Seller's agent's office during business hours) at any time prior to midnight local time of the 15th day following the date this Agreement is accepted by the Seller, or receipt by Purchaser of a current Public Offering Statement, whichever is later, may terminate this Agreement, and thereupon the Purchaser's entire Deposit shall be refunded and the parties hereto shall have no further rights or liabilities under this Agreement.

(b) [Spanish Equivalent]
El vendedor permitira al comprador un periodo de 15 dias para revisar los documentos referente a las leyes y regulaciones en el Distrito de Columbia. No obstante cualquier otra provision de este acuerdo, el comprador, podra a su elecion, responder al vendedor por medio de una carta registrada (o entregalo personalmente a la oficina del vendedor durante las horas del trabajo) en cualquer momento antes de la medianoche del decimoquinto dia que sigue la fecha senalada en el contrato firmado por el comprador, o, que el comprador haya recibido un Anuncio de Oferta Publica corriente, lo que suceda ultimamente, podra terminar el acuerdo, el comprador recibira su deposito y no habra ninguana obligacion entre las personas dentro de esta acuerdo.

[SIGNATURES ON FOLLOWING PAGE]

9

195450-1

DATE: 12/13/02

MAJID JAHANGIRI
_____
(Purchaser)

Social Security #: 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

Address: 8643 STONECUTTER RD
COLUMBIA, MD 21045

Telephone: Home (410) 995-5149
Office (301) 313-7305

DATE: 12/13/02

FARZAD DAVARYA
_____
(Purchaser)

Social Security #: 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

Address: 10205 SAVOY CT
ELLICOTT CITY, MD 21042

Telephone: Home (410) 750-8045
Office (301) 640-3402

**SELLER:**

By: METROPOLIS DEVELOPMENT COMPANY, L.L.C., a District of Columbia limited liability company
Managing Member

By: _____
S.P. Newell
Managing Member

Address: _____
Attn: _____
Telephone: (202) _____

**AGENT FOR SELLER:**

Maywood Company
_____

By: Katherine M. Wells
_____

DATE: 12-13-02

The following cooperating broker is hereby recognized:

Firm: _____
Address: _____
Agent: _____
Commission: $ _____ only in the event of Settlement
Cooperating broker not paid commission on Purchaser's options

**RECEIPT OF CONDOMINIUM INSTRUMENTS**

The undersigned Purchaser hereby acknowledge(s) that I (we) have received copies of the Public Offering Statement containing the Declaration, the Bylaws and the related documents for Langston Hughes Condominium, 1390 V, N.W. Washington, D.C. 20009.

Date: 12/13/02         M. Jahangiri
_____
(Purchaser)

Date: 12/13/02         Farzad Davarya
_____
(Purchaser)

10

195450-1