UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAMAN GHAHREMANI,

    Plaintiff,

    v.

UPTOWN PARTNERS, L.L.C.,

    Defendant.

Civil Action No. 05-1270 (CKK)

**MEMORANDUM OPINION**
(November 13, 2005)

Plaintiff Saman Ghahremani brought this action on June 23, 2005, against Defendant

Uptown Partners, L.L.C., seeking to enforce a Condominium Unit Purchase Agreement (the

"Contract") for a condominium located at 1390 V Street, N.W., Washington, D.C. 20009, Unit

321 (the "Unit").  Implicitly, Plaintiff's Complaint also alleges breach of contract and unjust

enrichment against Defendant.  In response, Defendant filed a Motion to Dismiss Plaintiff's

Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), and

for failure to join an indispensable party, pursuant to 12(b)(7), and also filed a Motion to Strike

Notice of Pendency of Action ("Lis Pendens") and to Quash the Encumbrance Created By Its

Filing.  Upon a consideration of Defendant's motions, Plaintiff's Opposition, Defendant's Reply,

Plaintiff's exhibits attached to his Complaint, and the relevant case law, the Court shall grant

Defendant's Motion to Dismiss for failure to state a claim and shall quash the relevant

encumbrance.

**I: BACKGROUND**

On December 13, 2002, Plaintiff and his friend, Farzel Davarya, entered into a real estate

contract with Defendant, pursuant to which Defendant was to sell the purchasers Unit 321 at the

Langston Hughes Lofts, a condominium building which was in the process of being built at the

intersection of 14th and V Streets, N.W., Washington, D.C.  Compl. ¶¶ 5-6; *see id.*, Ex. 1

(December 13, 2002 Contract).  Prior to the signing of the December 13, 2002 Contract, Plaintiff

contends that he and Mr. Davarya met with one of Defendant's real estate agents, who suggested

that Mr. Davarya be shown on the Contract as one of the purchasers because he was already on a

waiting list for a unit in the building, while Plaintiff was not on such a list.  *Id.* ¶ 6.  According to

Plaintiff, the agent assured them that there was no problem with including Mr. Davarya on the

agreement, and that the deed would be prepared to show Plaintiff as the sole purchaser at closing.

*Id.*  However, because of the waiting list problem, the December 13, 2002 Contract explicitly

lists Plaintiff and Mr. Davarya as the "purchasers" of the Unit, and both individuals signed the

actual document.  *Id.*, Ex. 1 (December 13, 2002 Contract) at 9.

      The December 13, 2002 Contract contains several provisions that are relevant to this suit.

In particular, two provisions place certain obligations on the purchaser(s) of a unit within the

Langston Hughes Loft.  First, Section 22(a) provides, in relevant part, "Purchaser shall have no

right to assign this Agreement without the prior written consent of Seller.  Any purported

assignment of this Agreement by Purchaser in violation hereof shall be voidable at the option of

Seller."  *Id.*, Ex. 1 (December 13, 2002 Contract) at § 22(a).  Second, Section 22(h) emphasizes

that

      PURCHASER HEREBY REPRESENTS AND WARRANTS THAT
      PURCHASER INTENDS TO OCCUPY THE PROPERTY AS A PRIMARY
      RESIDENCE.  ANY MISREPRESENTATION REGARDING PURCHASER'S
      INTENTION TO RESIDE IN THE UNIT SHALL CONSTITUTE A DEFAULT
      BY PURCHASER PURSUANT TO PARAGRAPH 15(a) HEREOF.

*Id.*, Ex. 1 (December 13, 2002 Contract) at § 22(h) (emphasis in original).  Both Plaintiff and Mr.

Davarya placed their initials next to Section 22(h) of the Contract, signifying their understanding

of the provision.  *See id.*

      Additionally, the December 13, 2002 Contract contains two other provisions that provide

certain protections to Defendant.  First, Section 22(c) ensures that:

> Purchaser is expressly prohibited from recording, and covenants not to record, this
> Agreement, any memorandum thereof of any list [sic] pendens, whether or not
> Seller is at any time in default hereof, and upon any recordation and attempted
> recordation, Purchaser shall be in default of this Agreement, and Seller shall have
> all rights and remedies to which it is entitled pursuant to Paragraph 15(a) hereof
> with respect to such default.

*Id.*, Ex. 1 (December 13, 2002 Contract) at § 22(c).  Second, Section 22(e) notes that

> This Agreement is not severable except with the prior written consent of Seller.  If
> any part of this Agreement is unenforceable or severed for any reason, then at
> Seller's election this Agreement may be terminated upon written notice to
> Purchaser and upon such termination Seller shall return Purchaser's Deposition
> and any other monies paid Seller hereunder and not then expended in connection
> with the Property, in which event the parties hereto shall be relieved of any and all
> further liability hereunder.

*Id.*, Ex. 1 (December 13, 2002 Contract) at § 22(e).  The Contract is governed by and interpreted

in accordance with the laws of the District of Columbia.  *Id.*, Ex. 1 (December 13, 2002

Contract) at § 22(q).[1]

---

[1] The Court has diversity jurisdiction over this contract dispute pursuant to 28 U.S.C. §
1332, given that Plaintiff is a citizen of Maryland, Compl. ¶ 1, Defendant is a limited liability
corporation organized under the laws of and located in the District of Columbia, *id.* ¶ 2, and the
contract price of the real estate in question is $255,900 – thereby exceeding the $75,000 statutory
requirement, *id.* ¶ 3.  This Court has personal jurisdiction over both Plaintiff and Defendant
because, by signing the Contract, all parties have expressly consented to personal jurisdiction in
the District of Columbia.  *See Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16, 84
S.Ct. 411, 11 L.Ed.2d 354 (1964) (holding that "parties to a contract may agree in advance to
submit to the jurisdiction of a given court . . . .");  Compl., Ex. 1 (December 13, 2002 Contract) at
§ 22(q).  Additionally, the Court notes that venue is proper in the District of Columbia, *see* 28

In September 2003, the parties entered into a price amendment related to certain options to be added to the Unit. *Id.* ¶ 8; *see also id.*, Ex. 3 (September 3, 2003 Price Amendment). However, despite not being a "purchaser" listed on the December 12, 2002 Contract, Plaintiff's wife was the only individual who formally signed off on this amendment. *Id.* ¶ 8; *see also id.*, Ex. 3 (September 3, 2003 Price Amendment) at 3. On April 2, 2005, another "price restate addendum" was entered into by the parties, modifying the final price of the Unit. *Id.* ¶ 7; *see also id.*, Ex. 2 (April 2, 2005 Price Restate Addendum). In the April 2, 2005 Price Restate Addendum, both Plaintiff and Mr. Davarya were explicitly listed as the "purchasers" of the Unit, although apparently Plaintiff was the only purchaser who signed the document. *Id.*, Ex. 2 (April 2, 2005 Price Restate Addendum) at 2.

By a letter dated May 18, 2005, Defendant gave notice through its real estate broker that it had scheduled settlement for June 1, 2005, and that settlement would be conducted by Regional Title, Inc., at its Washington, D.C. offices. *Id.* ¶ 10; *see also id.*, Ex. 4 (May 18, 2005 Settlement Notice). However, when Plaintiff and his wife appeared at the offices of Regional Title for settlement on June 1, 2005 "ready, willing and able to perform all of [the] obligations under the contract," they were informed by Regional Title that Defendant would not settle because Plaintiff "was asking for title 'in the wrong name.'" *Id.* ¶ 12. Defendant's reasoning was further explained in a letter from Defendant's real estate broker to Plaintiff and Mr. Davarya dated June 10, 2005, which announced that:

---

U.S.C. § 1391(a); Compl., Ex. 1 (December 13, 2002 Contract) at § 22(q) (stating that "[t]his Agreement shall be governed by the laws of the District of Columbia and the terms and provisions of this Agreement shall be interpreted and construed in accordance with said laws of the District of Columbia").

> Seller has instructed us to send you this formal notification that you are in default of Paragraph 22(h) of your Purchase Agreement to buy Condominium Unit 321 at Langston Lofts Condominium.  You indicated that it was to be your primary residence as required under the contract.

*Id.* ¶ 13; *see also id.*, Ex. 5 (June 10, 2005 Default Letter).

Apparently, Defendant did not believe that Mr. Davarya – who was not present at closing – intended to occupy the Unit as his primary residence.  Moreover, Defendant did not believe that Plaintiff and his family intended to occupy the Unit as their primary residence, as required by Section 22(h).  At the time of closing, Plaintiff's family included himself, a wife, and two children – one of which was born between the December 13, 2002 Contract and the day scheduled for closing.  Compl. ¶ 14.  Public records show that the Unit is a one bedroom condominium unit of less than 900 square feet.  *See* Def.'s Mot. to Dismiss at 1 n.1.  According to records of the Maryland State Department of Assessments and Taxation, Plaintiff purchased a 4,400 square foot single family home in Clarksville, Maryland, a mere three (3) months prior to the signing of the Contract to purchase the Unit.  *Id.*[2]  Due to its belief that the purchasers, and Plaintiff specifically, had violated Section 22(h) of the Contract, Defendant informed Plaintiff that it was willing to return his deposit of $13,000.00 and his options payment of $2,960.00 at his request but was otherwise terminating the Contract based on Plaintiff's breach.  Compl., Ex. 5 (June 10, 2005 Default Letter) at 1.

Plaintiff now contends that Defendant's stated justification for terminating the Contract is a pretext for illegitimate ulterior motives.  In support of this theory, Plaintiff notes that at the

---

[2] Plaintiff and his family remain in residence at the Clarksville, Maryland home.  *See* Compl. ¶ 1; *id.*, Ex. 1 (December 13, 2002 Contract) at 9 (listing Plaintiff's Clarksville address as his home); *id.*, Ex. 4 (May 18, 2005 Settlement Notice) at 1 (sent to Plaintiff's Clarksville address); *id.*, Ex. 5 (June 10, 2005 Default Letter) at 1 (same).

time he and Mr. Davarya signed the Contract on December 13, 2002, Defendant's real estate

broker was aware that Mr. Davarya had already signed another Condominium Unit Purchase

Agreement for a separate unit in the Langston Hughes Lofts.  *See* Pl.'s Opp'n, Ex. 1 (Davarya

Aff.) at 1, ¶ 6.  Therefore, Plaintiff argues that Defendant's representative was aware that Mr.

Davarya could not occupy both units as his "primary" residence. *Id.* at 6-7.  Moreover, Plaintiff

claims that the Unit's market value "has gone up substantially since 2002 and [Defendant] can

sell the Unit for approximately twice the amount . . . in the Contract," Compl. ¶ 18, giving

Defendant extra economic incentive to find a breach on the part of Plaintiff.  Finally, Plaintiff

asserts that Section 22(h) did not require that the Unit be used as the purchaser's primary

residence, and instead only required a representation that in 2002 Plaintiff *intended* the

condominium to be his primary residence.  *Id.* ¶ 14.  Because Plaintiff notes that he intended the

Unit to be his family's primary residence at the time of the initial contract signing on December

13, 2002, he argues that no violation of Section 22(h) actually occurred.  *Id.*[3]

     Given these contentions, Plaintiff asserts that it is Defendant who has defaulted and, as

such, he is the equitable owner of the Unit and is entitled to a lis pendens until this matter is

adjudicated.  *Id.* ¶ 22.  Plaintiff requests that this Court enter:  (1) "[i]njunctive relief prohibiting

the sale or encumbrance of the Property during these proceedings"; (2) "[a] declaration . . . that

[Plaintiff] is the equitable owner of the subject property"; (3) "[a]n Order . . . requiring specific

performance of the Contract" by Defendant; (4) "[a]n award of damages"; and (5) an award for

---

[3] Moreover, Plaintiff contends that Sections 7.8B(1) and B(4) of the Condominium
Bylaws, which are part of the "Condominium Instruments" incorporated through Section 23 of
the Contract, specifically contemplate that the purchasers of units within the Langston Hughes
Lofts may use the units for investment or rental purposes. *Id.* ¶¶ 15-17. As such, he argues that
the limitations of Section 22(h) are not applicable in practice.

costs and reasonable attorney's fees.  *Id.* at 5 (Prayer for Relief).  In response, Defendant

contends that dismissal of Plaintiff's action is warranted because he has violated multiple

provisions within the Contract and is entitled to no further relief outside of a return of his deposit

and options payment.  *See generally* Def.'s Mot. to Dismiss.

## II: LEGAL STANDARDS

In general, a motion to dismiss under Federal Rule of Civil Procedure 12(b) should not

prevail "unless plaintiffs can prove no set of facts in support of their claim that would entitle

them to relief."  *Kowal v. MCI Commc'n Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing

*Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).  In evaluating a Rule

12(b)(6) motion to dismiss for failure to state a claim, unlike resolving a motion under Rule

12(b)(1), the court must construe the complaint in a light most favorable to the plaintiff and must

accept as true all reasonable factual inferences drawn from well-pleaded factual allegations.  *In re*

*United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C.

1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint

must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all

inferences that can be derived from the facts alleged.").  While the court must construe the

Complaint in the Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such

inferences are not supported by the facts set out in the complaint."  *Kowal*, 16 F.3d at 1276.

Moreover, the court is not bound to accept the legal conclusions of the non-moving party.  *See*

*Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).

The court is limited to considering facts alleged in the complaint, any documents attached

to or incorporated in the complaint, matters of which the court may take judicial notice, and

matters of public record.  *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624

(D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C.

Cir. 1993); Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a

pleading is a part thereof for all purposes").  Factual allegations in briefs of memoranda of law

may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they

contain contradict those alleged in the complaint.  *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688

(D.C. Cir. 1994); *cf. Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773

(1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint

control).

　　　Accordingly, the court may dismiss a complaint for failure to state a claim only if it is

clear that no relief could be granted under any set of facts that could be proved consistent with

the allegations.  *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59

(1984); *Atchinson v. Dist. of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996).  However, the court

should grant a motion to dismiss "if an affirmative defense or other bar to relief appears on the

face of the complaint."  *Garrett v. Commonwealth Mortgage Corp.*, 938 F.2d 591, 594 (5th Cir.

1991) (citing *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 435 (5th Cir. 1990)),

*cert. denied*, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); 2A J. Moore & J. Lucas,

*Moore's Federal Practice* ¶ 12.07, at 12-68 through 12-69 (2d ed. 1990)); *see also Nwachukwu*

*v. Karl*, 223 F. Supp. 2d 60, 69 (D.D.C. 2002) (citing *Garrett*).

## III: DISCUSSION

　　　Defendant's Motion to Dismiss asserts that, even taking the factual allegations of the

Complaint to be true, dismissal is warranted because (1) Plaintiff's Complaint details three

separate breaches of the Contract by the Plaintiff, each of which act to bar any recovery by

Plaintiff, and (2) nothing in the Complaint excuses Plaintiff's own breaches of contract.  *See*

Def.'s Mot. to Dismiss at 3-11.[4]  Moreover, Defendant contends that Plaintiff's recording of a

Notice of Lis Pendens with the District of Columbia Recorder of Deeds, contemporaneous with

the filing of this suit, is in violation of Section 22(c) of the Contract and therefore should be

quashed.  *See* Def.'s Mot. to Strike Lis Pendens at 1, ¶¶ 3-6.  In response, Plaintiff argues that (1)

the Contract is an adhesion contract that is "utterly unconscionable and, among other things,

violative of the District of Columbia Consumer Protection Act," D.C. Code § 28-3901 *et seq.*

(1981 ed.), and its unconscionable provisions should therefore be struck from the bargain; and, in

the alternative, (2) Defendant's agent entered the contract with Plaintiff with full awareness that

Mr. Davarya was not a true "purchaser," and ratified the contract through such knowledge.  *See*

*generally* Pl.'s Opp'n.

In order to resolve Defendant's Motion to Dismiss, the Court shall first analyze whether

Plaintiff actually breached the December 13, 2002 Contract, as asserted by Defendant, and then

shall examine whether certain considerations may excuse Plaintiff's breach(es) and allow

Plaintiff to continue to enforce the Contract against Defendant.

    A.    *Based Upon the Facts Alleged in the Complaint, Did Plaintiff Breach the*
             *December 13, 2002 Contract as Constituted and Subsequently Modified?*

Upon a consideration of the factual allegations made in Plaintiff's Complaint and the

attached December 13, 2002 Contract, along with its subsequent modifications, it is clear on the

---

[4] Given the Court's holding as to Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) for failure to state a claim, the Court need not consider Defendant's Motion to Dismiss pursuant to Rule 12(b)(7) for failure to join Farzad Davaryad, whom it considers to be an indispensable party for the purposes of Rule 19.

face of these documents that Plaintiff breached the Contract with Defendant in four separate ways.

First, Section 4 of the Contract explicitly requires the defined "Purchaser" to "complete settlement on such date" as specified in the Settlement Notice provided to the unit's purchaser or purchasers. *See* Compl., Ex. 1 (December 13, 2002 Contract) at § 4.  Based solely on the explicit provisions of the Contract and its addendums, the "purchasers" of the Unit were Plaintiff and Mr. Davarya. *Id.* ¶ 6; *see also id.*, Ex. 1 (December 13, 2002 Contract) at 9; *id.*, Ex. 2 (April 2, 2005 Price Restate Addendum) at 1.  However, the Complaint clearly states on the date specified for settlement, June 1, 2005, "Dr. Ghahremani and his wife appeared at Regional Title, Inc., for the settlement as instructed," and further emphasizes that "Dr. Ghahremani appeared at settlement, ready, willing and able to perfrom all of his obligations under the contract." *Id.* ¶ 11.  It is apparent from the Complaint that Mr. Davarya did not attend the settlement, *id.*, and had no intention to close on the Contract, *id.* ¶ 6.

Importantly, where two or more parties to a contract promise the same performance to the same promisee, they incur a presumptive joint duty to fulfill the terms of the contract. Restatement (Second) of Contracts § 289(2) (1981 (noting a "presumption of joint obligation"); 12 Williston on Contracts § 36:3 (4th ed. 2005) ("an obligation entered into by more than one person is presumed to be joint"); *see also Clayman v. Goodman Props., Inc.*, 518 F.2d 1026, 1031-32 (D.C. Cir. 1974) (stating that the general rule in the District of Columbia is that "the obligation created by the promise of several persons is joint unless the contrary is made evident") (citations omitted).  Accordingly, both Plaintiff and Mr. Davarya, as the explicit "Purchasers" under the Contract, had a joint duty to attend the settlement and close on the Contract.  By failing

to ensure joint performance, Plaintiff and Mr. Davarya breached the facial requirements of Section 4 of the Contract.

Second, Section 22(h) of the Contract explicitly requires that the "Purchaser" warrants that he "INTENDS TO OCCUPY THE PROPERTY AS A PRIMARY RESIDENCE." *See id.*, Ex. 1 (December 13, 2002 Contract) at § 22(h).  Under the Contract, any misrepresentation concerning this intention constitutes a default on the part of the Purchaser.  *Id.*  Here, Plaintiff and Mr. Darvarya specifically represented their intention to occupy the Unit as their primary residence in the December 13, 2002 Contract, and specifically placed their initials next to Section 22(h) to emphasize their understanding of this requirement.  *Id.*  However, Plaintiff's Complaint makes it plain that on the date the Contract was signed, only Plaintiff, his wife, and his one child intended to reside in the Unit.  Compl. ¶ 14.  In his Affidavit attached to Plaintiff's Opposition, Mr. Davarya agrees with Plaintiff's factual allegation, noting that he "did not intend to live in both units," and was instead planning on residing in the other unit that he had purchased from Defendant.  Pl.'s Opp'n, Ex. 1 (Davarya Aff.) at 1, ¶ 6.  As such, on the face of Plaintiff's Complaint, it is clear that a joint obligor – i.e., Mr. Davarya – never intended to reside in the Unit.  Given this failing, Plaintiff and Mr. Davarya were clearly in breach of Section 22(h) of the Contract at the time it was signed.

Third, Section 22(a), in relevant part, provides that "Purchaser shall have no right to assign this Agreement without the prior written consent of Seller.  Any purported assignment of this Agreement by Purchaser in violation hereof shall be voidable at the option of Seller." Compl., Ex. 1 (December 13, 2002 Contract) at § 22(a).  Plaintiff's Complaint asserts that he had the sole right to close on the Contract.  *Id.* ¶ 11.  However, Mr. Davarya was clearly listed as a

11

co-Purchaser in all relevant documents leading up to the settlement date.  *Id.* ¶ 6; *see also id.*, Ex. 1 (December 13, 2002 Contract) at 9; *id.*, Ex. 2 (April 2, 2005 Price Restate Addendum) at 1.  If Mr. Davarya's rights under the Contract were somehow forfeited or transferred to Plaintiff, an explicit or implicit assignment must have occurred with the written consent of Defendant. However, Plaintiff's Complaint does not allege the existence of any written consent to the alleged assignment, and refers only to oral statements that Plaintiff would be permitted to sign the deed individually.  *Id.* ("The agent suggested that Mr. Davarya be shown on the Contract as one of the purchasers because he was already on a waiting list for a Unit and Dr. Ghahremani was not.  The agent assured them that there was no problem with that and that the deed would be prepared to show Dr. Ghahremani as the sole purchaser at closing.").  As such, Plaintiff's claim, which depends upon an assignment of Mr. Davarya's interest in the property to him, also reveals a breach of Section 22(a) of the Contract.

Fourth, Section 22(c) of the Contract provides that the Purchaser "is expressly prohibiting from recording, and covenants not to record, this Agreement, any memorandum thereof, or any list [sic] pendens . . . ."  *Id.*, Ex. 1 (December 13, 2002 Contract) at § 22(c).  Section 22(c) further emphasizes that any recordation or attempted recordation of a notice of pendency of action, i.e., lis pendens, by a Purchaser constitutes a "default of this Agreement," allowing Defendant to terminate the contract.  *Id.*  On June 23, 2005, Plaintiff filed the Complaint in this action, noting in the caption that "This suit involves title to real property, Unit 321, Lot 68, Square 236, recorded at Liber 196, Folio 79, Langston Hughes Condominium."  *Id.* at 1.  Plaintiff, asserting that he "is now the equitable owner of the Property and is entitled to a lis pendens until this matter is adjudicated and he has received both equitable and legal title to the Property," *id.* at ¶

22, simultaneously recorded a Notice of Lis Pendens with the District of Columbia Recorder of

Deeds.  *See* Def.'s Mot. to Strike Lis Pendens at 2, ¶ 5; Pl.'s Opp'n at 2-4.  By recording a notice

of pendency of action, Plaintiff violated the explicit prohibition outlined in Section 22(c) of the

Contract and, under the terms of the Contract, defaulted.

     In sum, on the face of Plaintiff's Complaint, taking all of Plaintiff's factual allegations as

true, it is plain that Plaintiff (and Mr. Davarya, his co-Purchaser) breached his Contract with

Defendant in four separate ways.  Mr. Davarya's failure to appear at settlement and intention not

to participate in the settlement violated Section 4 of the Contract; Plaintiff and Mr. Davarya did

not intend that the Unit would be their primary residence, violating Section 22(h) of the Contract;

Plaintiff's claim depends on an assignment of rights from Mr. Davarya, but no written consent

was given by Defendant allowing such an assignment, in violation of Section 22(a) of the

Contract; and Plaintiff recorded a lis pendens with the District of Columbia Recorder of Deeds,

in violation of Section 22(c) of the Contract.  Each of these breaches provides Defendant with the

authority under the Contract to terminate the deal and offer the Unit to other potential purchasers,

thereby undermining the claims made in Plaintiff's Complaint.  *See Ashcraft & Gerel v. Coady*,

244 F.3d 948, 952 (D.C. Cir. 2001) ("a party to a contract may defend [a breach of contract

claim] on the ground that there existed . . . a legal excuse for non-performance . . . .") (quoting

*Western Auto Supply Co. v. Sullivan*, 210 F.2d 36, 39-40 (8th Cir. 1954)); Restatement (Second)

of Contracts § 237, ill. 7.

> **B.     *Are There Certain Considerations that Excuse Plaintiff's Violations of the
> Contract or Render Specific Provisions of the Contract Inoperative?***

Before granting Defendant's Motion to Dismiss Plaintiff's Complaint based on Plaintiff's

own violations of the Contract, the Court must examine (1) whether certain considerations excuse Plaintiff's contravention of the explicit terms of the Contract, or (2) whether certain provisions of the Contract may be considered null and void as a matter of public policy, while other provisions remain enforceable by Plaintiff against Defendant.  The Court shall analyze each possibility raised by Plaintiff in his Opposition to Defendant's Motion to Dismiss in turn.

> 1.      Considerations Excusing or Modifying Plaintiff's Breach of the Contract's Explicit Terms

In his Opposition, Plaintiff contends that certain representations made by Defendant's real estate broker, identified as Kathryn W. Wells, during the process leading up to and including the signing of the December 13, 2002 Contract between Plaintiff and Defendant orally modified the terms of the written Contract.  Pl.'s Opp'n at 8-9.  According to Plaintiff, because Ms. Wells was aware that Mr. Davarya had signed a different contract for a separate unit in the building on the same day and was only listed as a "Purchaser" on the Contract with Plaintiff as a placeholder to circumvent the waiting list problem, Ms. Wells ratified the oral placeholder agreement.  *Id.*  Moreover, Plaintiff asserts that because Ms. Wells was an agent of Defendant, her knowledge and ratification of the oral modification may be imputed to Defendant.  *Id.*

In addition to the oral promises and actions taken by Defendant's agent on the date of the Contract signing, Plaintiff points out that events subsequent to the December 13, 2002 signing of the Contract reveal that Defendant proceeded with the understanding that the Contract was really between Defendant and Plaintiff, and did not include Mr. Davarya.  *Id.* at 9-10.  For instance, subsequent to December 13, 2002, Mr. Davarya notes:  "I was never contacted by the developer or its agents in regard to the Langston Hughes Condominium Unit Purchase which I had signed

14

along with Dr. Ghahremani or was otherwise treated by them as having any interest in the

matter."  Pl.'s Opp'n, Ex. 1 (Davarya Aff.) at 1, ¶ 8.  Plaintiff also emphasizes that it was he "and

his wife who signed the contract amendments . . . and it was the Ghahremani's who chose the

optional items for the unit and it was [Plaintiff] alone who was contacted to come to settlement."

*Id.* at 10.  According to Plaintiff,

> [o]n this record of repeated performance of inconsistent promises – the
> Amendments, the options package, the notice of settlement sent only to Dr.
> Ghahremani, and the failure to communicate at all with Mr. Davarya about this
> contract – all demonstrate that the contract had been modified to eliminate Mr.
> Davarya as the purchaser.

*Id.* at 11.

 Two legal theories possibly support Plaintiff's contention:  (1) the December 13, 2002

Contract was not a completely integrated document, and was modified by the oral promises made

by Defendant's agent Ms. Wells at the time of the Contract signing; or (2) the December 13,

2002 Contract was completely integrated and reflected the full scope of the agreement between

the parties, but subsequent communications and practices modified the terms of the agreement in

a manner that essentially wrote Mr. Davarya out of the Contract.  The Court shall investigate

each theory as it relates to Plaintiff's claim.

i.     *Incomplete Integration*

As noted above, Plaintiff's first argument attempting to excuse or explain away any

"breach" of the Contract's explicit terms is his assertion that the promises made by Ms. Wells,

Defendant's agent, at the December 13, 2002 signing of the Contract constituted an oral

modification of the written agreement whereby Mr. Davarya was essentially written out of the

transaction for all practical purposes.  *See* Pl.'s Opp'n at 6-9.  Accordingly, the issue of whether

the Contract was completely integrated via the writing becomes relevant.

As explained by the District of Columbia Court of Appeals, "[w]hen parties to a contract have executed a completely integrated written agreement, it supersedes all other understandings and agreements with respect to the subject matter of the agreement between the parties, whether consistent or inconsistent, and is viewed as the sole expression of the parties' intent." *Masurovsky v. Green*, 687 A.2d 198, 203 (D.C. 1997) (citing *Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 126-27 (D.C. 1992); *Ozerol v. Howard Univ.*, 545 A.2d 638, 641 (D.C. 1988)).  "A completely integrated agreement is one adopted by the parties as a complete and exclusive statement of the terms of the agreement." *Ozerol*, 545 A.2d at 641.  In contrast, a partially integrated agreement is one in which "the writing represents the agreement of the parties with respect to the matters stated therein but where there may be additional consistent oral terms." *Id.* (citing Restatement (Second) of Contracts § 213 (1979)).

"The question whether an agreement is completely integrated is a preliminary question of fact for the trial court." *Good Food Servs.*, 608 A.2d at 126; *Masurovsky*, 687 A.2d at 202; *see also* Restatement (Second) of Contracts § 210(3).  The court's factual inquiry is to focus on the intent of the parties at the time they entered the agreement. *Id.*  In determining the parties' intent, the court is to examine "the conduct and language of the parties and the surrounding circumstances. *The document alone will not suffice.*" *Good Food Servs.*, 608 A.2d at 126 (emphasis altered); *see also Masurovsky*, 687 A.2d at 202-03; *Ozerol*, 545 A.2d at 641.  In determining whether the agreement is completely or only partially integrated, a court may therefore analyze the written agreement itself, "[a]greements or negotiations prior to or contemporaneous with the adoption of a writing," *Good Food Servs.*, 608 A.2d at 127 (quoting

16

Restatement (Second) of Contracts § 214; *id.* at § 210, ill. 1), and the presence or absence of a

merger clause indicating complete integration – a factor which may be "significant, though not

conclusive," *id.* (citing II Farnsworth on Contracts § 7.3, at 204-07 (1990)).  Importantly, in

considering the relevant evidence and determining whether the parties intended a writing to be

completely integrated, the trial court is not to apply the parol evidence rule.  *Id.* (citing

Restatement (Second) of Contracts § 214, comment a)).  "That rule only comes into play after the

court has decided that the writing is completely, rather than partially, integrated."  *Id.* (citing

*Ozerol*, 545 A.2d at 641-42).[5]

        In this case, the December 13, 2002 Contract between the parties contains a specific

integration clause.  Section 22(d) provides:

> This Agreement and its addenda, if any, contains the final and entire agreement
> between the parties hereto, and the parties hereto shall not be bound by any terms,
> conditions, statements, warranties, or representations, oral or written, not herein
> contained.  Purchaser agrees that Purchaser will rely only upon representations set
> forth in this Agreement.  No action or inaction by Seller shall constitute a waiver
> of any default or obligation under this Agreement and no waiver of any default or
> obligation shall be effective unless it is in writing and signed by Seller.

Compl., Ex. 1 (December 13, 2002 Contract) at § 22(d).  However, Plaintiff's Complaint is

replete with factual allegations indicating that the parties intended their agreement to go beyond

the limiting explicit terms of the Contract from the very beginning.  *See id.* ¶¶ 6-8, 10.  Indeed, as

Mr. Davarya's Affidavit indicates, Defendant – through its agent – was aware that certain terms

of the written Contract, i.e., whether Mr. Davarya would use the Unit as his primary residence,

---

        [5] The parol evidence rule ensures that if an agreement is partially integrated, e.g. part
written and part oral, the writing supersedes inconsistent terms of previous agreements.  If an
agreement is completed integrated, the writing supersedes all written or oral arguments within its
scope.  *Good Food*, 608 A.2d at 127 n.8 (citing Restatement (Second) of Contracts § 213).

were in direct contradiction to other agreements entered by Defendant.  Pl.'s Opp'n, Ex. 1

(Davarya Aff.) at 1, ¶¶ 5-6.  Given the facts cited by Plaintiff and the alleged oral representations

made by Defendant's agent Ms. Wells, the Court – providing Plaintiff all inferences due under a

Rule 12(b)(6) motion – concludes that there is, at minimum, a genuine issue of fact as to whether

the Contract is a completely, or only partially, integrated agreement at this time.

   However, whether this issue of fact is *material* depends upon whether Plaintiff can show

that there is *also* a genuine issue as to the existence of additional oral terms that are consistent

with the written Contract.  If not, then the status of the Contract as completely, or only partially,

integrated becomes immaterial, as the only consequence of proving a partially integrated

agreement is that the agreement may be expanded to include "additional oral terms that are

consistent with the writing . . . ."  *Ozerol*, 545 A.2d at 642 n.6 (citing Restatement (Second) of

Contracts §§ 213, 215, 216).  As explained by the District of Columbia Court of Appeals, "to be

successful," a claim that an oral term should be added to a written contract "require[s] the

additional term to be consistent with the written agreement and either to have been agreed to for

separate consideration or be such a term in the circumstances might naturally have been omitted

from the writing."  *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 206 n.9

(D.C. 1984).  Here, the terms that Plaintiff seeks to have added to the explicit written Contract –

i.e., that Mr. Davarya will not be a "Purchaser" of the Unit in reality, will not use the Unit as his

primary residence, and will not be obligated under the terms of the written deal – directly

contradict the stated terms in the Contract.  Because a "writing supersedes inconsistent terms of

previous agreements," even when a contract is only partially integrated, *Good Food Servs.*, 608

A.2d at 127 n.8, the Court finds that the explicit terms of the Contract identifying both Plaintiff

and Mr. Davarya as the co-Purchasers of the Unit and listing their joint obligations supersedes

Mr. Wells' alleged representations that the parties could proceed with the Contract but list only

Plaintiff on the deed, even accepting (for the purposes of a motion to dismiss) the facts as stated

by Plaintiff.  Accordingly, the Court finds that an agreement to proceed with Mr. Davarya as only

a nominal party, with no duties or obligations under the Contract, cannot be considered an

additional oral term to the (presumptively) partially integrated Contract.

Accordingly, Plaintiff cannot establish a claim that the Contract was partially integrated

at its inception and was altered by a contemporaneous oral agreement to supersede the rights,

duties, and obligations of Mr. Davarya.  This conclusion renders immaterial the dispute over

whether the Contract is a completely integrated, or only partially integrated, agreement.

Regardless of how the Contract is characterized, no terms other than those directly memorialized

in the written Contract can be considered part of the agreement reached by the parties on

December 13, 2002.

ii.     *Subsequent Modification*

While it is clear that there was no binding oral modification of the Contract adding

inconsistent terms at the time of its writing on December 13, 2002, Plaintiff argues – in the

alternative – that the Contract was subsequently modified through (1) the various addendums to

the Contract entered into by the parties or (2) the alleged oral promises by Defendant's broker

and the parties course of dealing, which were inconsistent with the Contract's explicit provisions.

*See* Pl.'s Opp'n at 10-11.  A review of the facts alleged in Plaintiff's Complaint, the attached

addendums, and the relevant case law indicates that Plaintiff's contention has no support.

First, a review of the addendums to the Contract undermines Plaintiff's assertion that they somehow modified the December 13, 2002 Contract to the exclusion of Mr. Davarya. The first "addendum" to the Contract took place in late August/early September 2003, as Plaintiff filled out and submitted a document entitled "Langston Lofts Schedule B." *See* Compl., Ex. 3 (September 3, 2003 Price Amendment). This document is obviously the option sheet contemplated by Section 3(b) of the December 13, 2002 Contract, which gives the Purchaser the right to select items from Defendant's list of available features. *See id.*, Ex. 1 (December 13, 2002 Contract) at § 3(b) ("Unless previously selected by Seller or a previous potential purchaser, Purchaser shall have the right to select items from Seller's list of available features to be provided by Seller in accordance with the policy applicable thereto prescribed the Seller."). Plaintiff contends that this addendum modified the Contract, eliminating Mr. Davarya as a formal "Purchaser" and removing his obligations thereunder, because the document was signed only by Defendant and Mrs. Ghahremani – indicating that Defendant was aware of and consented to the modification. Compl. ¶ 8; *see also id.*, Ex. 3 (September 3, 2003 Price Amendment) at 3 (only one, illegible signature next to the relevant space for "Purchaser(s)").

Plaintiff's contention is without foundation: a plain review of the document reveals that it does not purport to modify the Contract in any way; rather, the document is a simple and unambiguous recital of the options desired by the Purchasers. There is simply no explicit provision dealing with the modification of the "Purchasers" listed in the December 13, 2002 Contract. Even accepting as true Plaintiff's allegation that only his wife signed the document, the Contract is not amended through this action, as there is nothing to suggest – nor is it alleged – that Plaintiff's wife was not authorized to sign the document on behalf of the Purchasers. Given

20

the plain, clear, and definite language of this addendum, Plaintiff's claim that this document

somehow altered the underlying rights and responsibilities under the December 13, 2002

Contract is without foundation. *See Dist. of Columbia v. Washington Hosp. Ctr.*, 722 A.2d 332,

342 (D.C. 1988) ("Where the language is clear and unambiguous, its plain language is relied

upon in determining the parties intent.  Where the terms of the document leave no room for

doubt, the effect . . . can be determined as a matter of law."); *GLM P'ship v. Hartford Cas. Ins.

Co.*, 753 A.2d 995, 998 (D.C. 2000) (same).

The second and final addendum focused on by Plaintiff was a "Price Restate Addendum"

entered into by the parties on April 2, 2005.  *See* Compl., Ex. 2 (April 2, 2005 Price Restate

Addendum).  Notably, this addendum explicitly defines the "Purchaser" as Plaintiff and Mr.

Davarya.  *Id.*, Ex. 2 (April 2, 2005 Price Restate Addendum) at 1.  However, Plaintiff emphasizes

that this document somehow altered the rights and responsibilities of the Purchasers under the

Contract, thereby eliminating Mr. Davarya's rights, obligations, and duties thereunder, because

he was the only signatory to the addendum.  *Id.* ¶ 7; *id.*, Ex. 2 (April 2, 2005 Price Restate

Addendum) at 2 (Plaintiff signed in two separate places, next to "Purchaser").

Once again, Plaintiff's argument is without any support.  The document does not purport

to amend the identity of the "Purchasers" of the Unit, and makes no such reference; rather, the

addendum modifies only the purchase price.  *See* Compl., Ex. 2 (April 2, 2005 Price Restate

Addendum).  Indeed, the Price Restate Addendum emphasizes that the parties wish to modify the

contract only "as hereinafter set forth"; the addendum then states that the "Agreement is modified

as follows," after which the document contains language modifying only the purchase price, not

the identity of the "Purchasers."  *Id.*, Ex. 2 (April 2, 2005 Price Restate Addendum) at 2.  The

21

document further states:

> This Addendum shall not alter, modify, or change in any other respect the
> Agreement, and except as modified herein, all of the terms and provisions of the
> Agreement are hereby expressly ratified and confirmed and shall remain in full
> force and effect.

*Id.*  While it is true that Plaintiff signed the document in two places, there is no indication

whatsoever that this action somehow deleted Mr. Davarya as a defined "Purchaser."  Moreover,

given the fact that Plaintiff's wife, who is not a defined "Purchaser," was the only individual to

sign the September 3, 2003 Price Amendment – an action which did not somehow eliminate

Plaintiff as a "Purchaser" –  it seems likely that Plaintiff's decision to sign the document twice

simply reflected that he was signing the document once on behalf of himself and once on behalf

of Mr. Davarya, as authorized.  Regardless, the plain language of the April 2, 2005 Addendum

evidences no intention of the parties to make a change to the Contract's identified "Purchasers."

Accordingly, Plaintiff is unable to sustain a claim that the written addendums to the Contract

altered its language and eliminated Mr. Davarya's explicit role in the agreement.

Second, Plaintiff's alternative argument that the oral promises of Defendant's broker and

the parties subsequent course of dealings eliminated the express role provided Mr. Davarya is

also without merit.  Importantly, Plaintiff's contention brings up a new issue relevant to the

Court's consideration whenever the sale of real property, rather than the U.C.C.-governed sale of

commercial goods,[6] is at stake:  the statute of frauds.  In the District of Columbia, "[t]he statute

of frauds mandates that certain agreements, including those concerning real estate, must be in

---

[6] Given the distinction between the sale of land and the sale of commercial goods, certain
U.C.C. provisions such as D.C. Code § 28:2-202 (allowing the course of the parties' dealings to
help explain or supplement the written agreement) and D.C. Code § 28:209 (governing contract
waiver and modification) are not applicable in this context.

writing 'to guard against perjury and protect against unfounded and fraudulent claims.'" *Railan v. Katyal*, 766 A.2d 998, 1007 (D.C. 2001) (quoting *Tauber v. Dist. of Columbia*, 511 A.2d 23, 27 (D.C. 1986)); *see Hackney v. Morelite Constr.*, 418 A.2d 1062, 1065-66 (D.C. 1980) (recounting the history of the statute of frauds); *see also* D.C. Code § 28-3502 (2001) ("An action may not be brought . . . upon a contract or sale of real estate, of any interest in or concerning it, . . . unless the agreement is brought, or a memorandum or note thereof, is in writing . . . ."). The District of Columbia Court of Appeals has held that subsequent oral modifications to a written real estate agreement are unenforceable as contrary to the statute of frauds. *See Landow v. Georgetown-Inland West Corp.*, 454 A.2d 310, 313-14 (D.C. 1982). Plaintiff's attempt to circumvent the express language in the Contract through an argument involving subsequent oral modifications and course of dealing allegations appears to be without merit.

However, "[t]here are several situations where courts may refuse to allow the defendant to interpose a statute of frauds defense even if it is properly raised": (1) where the defendant's own fraud was responsible for the non-existence of the required signed memorandum (equitable estoppel); (2) where the equitable doctrine of part performance was applicable (promissory estoppel); and (3) where the defendant has admitted the contract (waiver). *Railan*, 766 A.2d at 1007-08 (quoting *Hackney*, 418 A.2d at 1066). There can be no waiver in this case, as Defendant has not admitted the alleged modification, and because there is an express, enforceable contract governing the relationship out of which the promise emerged, there can be no assertion of promissory estoppel. *See Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 71 (D.D.C. 2005) (citing cases).

With respect to equitable estoppel, "[a]n oral agreement to purchase land is taken out of the Statute of Frauds only when the purchaser has changed his position so materially that unless the oral contract is enforced, fraud will result." *Landow*, 454 A.2d at 313-14 (citing cases). "Mere refusal to perform an oral contract within the statute does not generally constitute such fraud as to raise the estoppel." *Id.* at 314 (citation omitted). Rather, "in order to effectively assert estoppel, the promisee must be able to show that he has changed his position substantially for the worse and that he has incurred unjust and unconscionable injury." *Id.* (citing Williston on Contracts § 553, at 808 (3d ed. 1959)). In this case, Plaintiff's alleged injuries do not rise to the required level to overcome the statute of frauds. Plaintiff expended roughly $15,960.00 in his quest to purchase the Unit, *see* Compl., Ex. 5 (June 10, 2005 Default Letter), all of which Defendant is willing to return, *id.*, for a condominium unit that he now admits is not for his primary residence, but is solely for investment purposes, *see* Compl. ¶¶ 13, 16-17. *Cf. Landow*, 454 A.2d at 314 (finding that "[t]he buyer has failed to demonstrate sufficient damages incurred in reliance on or in performance of the oral agreement to estop appellee from asserting the Statute of Frauds" where $150,000 in expenses had been incurred, of which roughly $50,000 was directly attributable to the oral agreement).

Even assuming *arguendo* that the statute of frauds did not operate to bar Plaintiff's claim that subsequent oral promises or the parties' course of dealing eliminated Mr. Davarya from the explicit Contract, Plaintiff's attempt to substantiate his claim through these avenues fails for multiple other reasons. First, Section 22(a) bars all subsequent assignments or modifications of the "Purchasers" of the Unit unless the prior written consent of Defendant is obtained. *See* Compl., Ex. 1 (December 13, 2002 Contract) at § 22(a). Some District of Columbia courts have

24

held that such clauses bar any subsequent oral modifications, noting that "[c]ontracting parties may modify a written agreement by subsequent oral communications, unless a clause bars such modification." *Hildreth Consulting Eng'rs v. Larry E. Knight, Inc.*, 801 A.2d 967, 974 (D.C. 2002); *see also Marlowe v. Argentine Naval Comm'n*, 808 F.2d 120, 123 (D.C. Cir. 1986) (same); D.C. Code § 28:2-209(2) ("A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded . . . . ."); *but see Daisley*, 372 F. Supp. 2d at 70 n.4 (quoting *Puma v. Sullivan*, 746 A.2d 871, 875 (D.C. 2000) ("a written contract may be modified or rescinded by a subsequent oral agreement, even where the contract contains express language prohibiting oral modifications")); *Clark v. Clark*, 535 A.2d 872, 876 (D.C. 1987); (same); *Nickel v. Scott*, 59 A.2d 206, 207 (D.C. 1948) (same); *cf. Martinsville Nylon Employees Council Corp. v. Nat'l Labor Relations Bd.*, 969 F.2d 1263, 1267 (D.C. Cir. 1992) (noting the distinction between the common law rule, allowing subsequent oral modification despite clause, and the UCC rules, making "no-oral-modification clauses" binding, but stating "[w]e need not finally choose today" between the options).  As such, it is unclear whether the presence of Section 22(a) alone would be sufficient to bar Plaintiff's reliance on subsequent oral communications as a matter of District of Columbia law.

Importantly, however, Section 22(a) interacts with another section of the Contract – Section 22(d) – which provides that "the final and entire agreement between the parties hereto" consists of only "[t]his Agreement and its addenda, if any," and cannot contain any "terms, conditions, statements, warranties, or representations, oral or written, not herein contained."  *See* Compl., Ex. 1 (December 13, 2002 Contract) at § 22(d).  The combination of Section 22(a) and Section 22(d) undermines Plaintiff's attempted avenue of redress because, as the D.C. Circuit

25

explained in *Martinsville Nylon Employees Council*,

> Whatever the ultimate merits of the common law rule denying effect to the no-oral-modifications clause, by including the entire agreement clause the parties here made clear beyond doubt their intention not to be bound to any informal arrangement to which they might voluntarily adhere during the term of their CBA. In effect, each told the other: "If you want anything else, you'll have to get it in writing," and to this both agreed.

> \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

> The additional requirement in this case that any further agreements be in writing indicates that the parties anticipated the possibility of entering into further agreements and specifically provided a procedure for incorporating them into their CBA–regardless of whether they merely go beyond the terms of the written contract or actually conflict with it.  Again, we see no policy reason to ignore the plain intent of the parties to limit their contractual liability to those agreements to which they have affixed their signatures.

*Martinsville Nylon Employees Council*, 969 F.2d at 1268-69.  Accordingly, in this instance, the "no oral modifications" clause of Section 22(a) and the "entire agreement" clause of Section 22(d) forestall any alteration to the Contract through oral modifications or subsequent performance.  Plaintiff's claim of redress pursuant to these avenues is therefore without merit.

Second, even *assuming* arguendo that neither the statute of frauds nor the "no oral modifications"/"entire agreement" clauses barred consideration of oral promises and subsequent performance, to the extent that Plaintiff is attempting to rely on a course of performance/course of dealing argument to support his alteration theory, his claim is without foundation.  Here, little to no "performance" actually occurred under the Contract, as Defendant found that Plaintiff had defaulted in his pre-settlement obligations and the Unit was never exchanged pursuant to the terms of the deal.  Faced with a similar situation, the D.C. Circuit in *Marlowe* rejected a party's claims of subsequent modifications, finding that

26

> [h]ere at best there was a course of dealing, which is not only of weaker effect
> than a course of performance, *see* D.C. Code Ann. §§ 28:2-208(2), 28:1-205
> (1981), but does not create the same strong equities as actual performance and
> repeated acceptance over a period of time.

*Marlowe*, 808 F.2d at 124 (citing D.C. Code Ann. § 28:2-208(3) (1981) (mentioning course of

performance, but not course of dealing, as relevant to show waiver).

In sum, the Court finds that Plaintiff may not substantiate his claims upon an assertion

that the parties' subsequent oral promises or course of performance somehow altered the

relationships explicitly set out in the December 13, 2002 Contract.  Rather, such an argument is

barred by the applicable statute of frauds in the real estate context, the interaction between the

Contract's "no oral agreements"/"entire agreement" clauses, and the undisputed fact that no

"performance" actually occurred.  The terms of the December 13, 2002 Contract – including the

provisions governing the rights, duties, and obligations of all listed "Purchasers" – continued

unaltered throughout the course of the parties' relationship, and therefore Plaintiff's four separate

breaches of the Contract, described in Section III(A) *supra*, cannot be excused.

## 2.    Unconscionability

Plaintiff's final argument attempting to excuse his various breaches of the Contract is his

contention that the Contract is an adhesion contract and the various provisions of the Contract are

unconscionable.  *See* Pl.'s Opp'n at 3-6, 7, 11-16.  As such, Plaintiff seeks to have certain

"unconscionable" provisions stricken from the Contract; these provisions include Section 4(a)

(vesting equitable title in the Seller until the delivery of the deed), Section 15 (if Purchaser in his

default, he agrees that his deposit, along with the interest earned, is "forfeited as liquidated

damages" but if Seller defaults, Purchaser gets back his deposit "as Purchaser's sole damages"),

27

and Section 22(c) (forbidding a Purchaser from recording a lis pendens).  *Id.*  According to

Plaintiff, these three provisions ensure that the December 13, 2002, as presently constituted,

lacks mutuality of obligation or consideration and therefore "is not a contract that this Court

should consider enforcing."  *Id.* at 6.

    At least three problems undermine Plaintiff's "unconscionability" argument, even

assuming *arguendo* that the December 13, 2002 Contract was actually an unconscionable

contract of adhesion.  First, Section 22(e) of the Contract provides:

> This Agreement is not severable except with the prior written consent of Seller.  If
> any part of this Agreement is unenforceable or severed for any reason, then at
> Seller's election this Agreement may be terminated upon written notice to
> Purchaser and upon such termination Seller shall return Purchaser's Deposition
> and any other monies paid Seller hereunder and not then expended in connection
> with the Property, in which event the parties hereto shall be relieved of any and all
> further liability hereunder.

*Id.*, Ex. 1 (December 13, 2002 Contract) at § 22(e).  Accordingly, even if the provisions cited by

Plaintiff were considered unconscionable as a matter of law, Section 22(e) prevents those

provisions from being severed and the rest of the Contract being enforced.  Rather, by the parties'

own agreement, the whole Contract would be null and void.  Plaintiff's Complaint depends upon

an enforceable agreement between the parties.  With the December 13, 2002 Contract terminated,

Plaintiff has no agreement under which to require Defendant to hand over ownership of the Unit.

    Second, Plaintiff and Mr. Davarya breached four provisions of the Contract – Section 4,

Section 22(h), Section 22(a), and Section 22(c) of the Contract.  However, Plaintiff only

explicitly identifies Section 4 and Section 22(c) as being unconscionable.  Therefore, even

assuming that the two identified provisions actually are unconscionable and could somehow be

stricken from the Contract while effectuating its other provisions, Plaintiff would still have two

28

unexcused breaches entitling Defendant to termination of the deal.  Plaintiff's attempt to gain

ownership of the Unit via his Complaint would then fail due to his own breaches of the Contract.

Third, accepting Plaintiff's argument as correct – that the Contract lacks mutuality of

obligation or consideration because it eliminates Plaintiff's remedies upon a breach by Defendant

– then the parties did not enter into a valid contract, and there is no contract for this Court to

specifically enforce.  *See* Pl.'s Opp'n at 3-5.  Under most general principles of contract law, an

express contract requires an offer and an acceptance, and must be supported by consideration.

*See Virtual Def. and Dev. Int'l, Inc. v. Republic of Moldava*, 133 F. Supp. 2d 9, 16-17 (D.D.C.

2001); *Goozh v. Capitol Souvenir Co., Inc.*, 462 A.2d 1140, 1142 n. 3 (D.C. 1983) (citations

omitted).  Indeed, consideration or mutuality of obligation is a requirement for the formation of a

bilateral contract.  *See King v. Indus. Bank of Washington*, 474 A.2d 151, 156 (D.C. 1984) (citing

cases); Restatement (Second) of Contracts § 17(1).  When there is no consideration or mutuality

of obligation, courts within the District of Columbia have held that equity cannot be invoked to

enforce a contract that lacks consideration.  *Cf. Flack v. Lester*, 417 A.2d 393, 400 (D.C. 1980);

*Drazin v. Am. Oil Co.*, 395 A.2d 32, 34 & n.3 (D.C. 1978).  Therefore, if the Court takes

Plaintiff's allegation that the Contract lacks mutuality of obligation and consideration on its face,

such that this "is not a contract that this Court should consider enforcing," Pl.'s Opp'n at 5, it is

clear that the Contract lacked an essential element required for both contract formation and the

remedy of specific performance.  The Contract would therefore be void and unenforceable by any

party.  With an unenforceable Contract, Plaintiff would be left with no avenue of redress based

on the present Complaint against Defendant.  Accordingly, an argument revolving around

unconscionability is insufficient to excuse all of Plaintiff's breaches and – even if true – leaves

Plaintiff without an avenue of legal redress to gain title to the Unit as demanded.  As such, the

claims contained within Plaintiff's Complaint are without foundation.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendant's Motion to Dismiss and

Defendant's Motion to Strike Notice of Pendency of Action (Lis Pendens) and to Quash the

Encumbrance Created By Its Filing.


Date:   November 13, 2005


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge